

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-17-2007

# Chen v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-2736

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Chen v. Atty Gen USA" (2007). *2007 Decisions.* Paper 754.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/754

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

No. 06-2736

———————————

ZHAN CHEN,
Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES
Respondent

———————————

On Petition for Review of an Order of the
Board of Immigration Appeals
U.S. Department of Justice, Executive Office of Immigration Review
(BIA No. A72-182-685)
I.J. Eugene Pugliese

———————————

Submitted under Third Circuit L.A.R. 34.1(a)
June 29, 2007

———————————

Before: BARRY, FUENTES, and GARTH, Circuit Judges

(Opinion Filed: July 17, 2007)

———————————

OPINION

———————————

GARTH, Circuit Judge:

Petitioner Zhan Chen seeks review of a final order of removal entered by the Board of Immigration Appeals ("BIA") on May 1, 2006. Chen first contends that the Immigration Judge ("IJ") and BIA erred by failing to waive the one-year time requirement for filing an asylum application. He also challenges the adverse credibility determination made by the IJ and affirmed by the BIA, arguing that he did credibly demonstrate eligibility for asylum and withholding of removal. We will dismiss the petition in part and deny it in part.

I.

Chen was born in China on September 30, 1975 and arrived by boat in the Virgin Islands on December 24, 1994, where he was detained by the INS as an immigrant not in possession of immigrant documentation.[1] Chen states that, upon the advice of his smuggler, he lied about his age to the immigration authorities, and he was placed in a foster home in Minnesota in early January 1995. He fled the foster home on January 23, 1995, and failed to appear at an Immigration Court hearing on this matter held in Chicago on August 21, 1995. The Immigration Judge entered an order of exclusion and deportation. Chen claims that he was never informed of the hearing, and that an associate of his smuggler had sent him to Flushing, New York.

In late 2002, Chen submitted a Form I-485 application for adjustment of status to permanent resident pursuant to a marriage to a United States citizen, Tanya Torres. They

_____

[1] In a July 25, 2005 hearing, Chen, represented by counsel, admitted this charge and conceded his removability.

were married by a judge, not a clergyman.[2] In the I-485 application, Chen indicated that he had never been arrested inside or outside of the United States. Later, he claimed that the form was prepared by his lawyer and he just signed it. The marriage to Torres ended in divorce and Chen's status adjustment application was denied as abandoned on August 26, 2004.

Chen stated that he married his current wife, Li Yong Chen, on July 1, 2003, and that their daughter was born on January 6, 2004. He related that his wife does not have Immigration status, and that the marriage certificate was issued by a church but that the marriage was never registered with the government. Chen says that the couple would like to have more children, but that this would be prohibited in China.

In late 2004, Chen was convicted of alcohol-related charges in New Jersey, which led to his arrest by immigration officials in June 2005. On June 17, 2005, he filed a motion in Bloomington, Minnesota to reopen proceedings and stay removal, and on July 13, 2005, he filed a motion to change venue to Newark, New Jersey. The next day, the Immigration Judge granted the motion to change venue.

Four immigration court hearings were held from July 25, 2005 to November 14, 2005, all resulting in continuances for various reasons. Meanwhile, on August 29, 2005, nearly eleven years after arriving in the United States, Chen filed an application for asylum and

---

[2]When asked about this marriage in the hearing before the IJ, Chen testified that a reason the couple did not get married in a church was that the civil and church marriage ceremonies do not significantly differ. Chen also stated that Torres did not speak Chinese, but that he had learned enough English for "every day activities." (App. 197.)

withholding of removal, alleging religious persecution and seeking protection under the Convention Against Torture ("CAT").

IJ Pugliese held a merits hearing on December 5, 2005. Two people testified: Chen and Kevin N. Caffrey, an expert witness regarding treatment of religious minorities in China.

Chen testified that he had been a Christian since childhood, that his entire family is Christian, and that his grandmother told him Bible stories. He said that he attended the Christian church sanctioned by the Chinese government on Sundays. Chen said that in August 1991, he was "semi forced" by his parents to be baptized in the government-sanctioned church and that he "was not crazy about being baptized."

Chen testified that he did not become a firm believer in his religion until around 1992. Several events prompted this change, including the healing of his grandmother's partially paralyzed hand, which family members attributed to God's work. Chen stated that in 1992 he also began attending a Bible study group of six people in a private home. This group was not part of the state-sanctioned church. He said that attending the gatherings allowed him to learn more about the Bible than he learned in the state-sanctioned church, and that they were more focused on scripture and less focused on loyalty to the government.

Chen claimed that he and the five others in his Bible study group were arrested in March 1993 for holding an illegal religious study group. He was detained overnight and released when his mother paid a fine. Chen stated that when he returned to school, his teacher warned him that he should not attend any more meetings.

Chen said that shortly thereafter he and the same five people were arrested again for

4

taking part in the religious meetings. He stated that after several hours in detention and an interrogation, two officers took him into another room, taped his mouth, and handcuffed him to the floor. The officers then called him a "handsome little boy," pulled down his pants, started touching him, and then "those two just raped [him]." Chen said that he was released the next day when his mother paid another fine, and that he never told anyone about the rape because he considered it too shameful. The rape allegations were not part of Chen's original I-589 asylum application, and were only later added in a handwritten addendum.

After the second arrest, Chen said that his teacher and his school's political instructor told him that his activities were bringing trouble to the school, and that he could either volunteer to leave school or they would dismiss him. Chen left school, found a job, and attended only the state-sanctioned church until January 1994 when he again began attending the small religious gatherings.

Chen testified that a few months later, the group began distributing on the street pamphlets containing Bible verses. After distributing these pamphlets twice, Chen said that an official came to his home and warned him to stop distributing the flyers. The official told Chen that he should testify against the person instigating these activities, in exchange for lenient treatment by the police. Chen said that his mother convinced the official to leave and return the next day, so that she could convince Chen to cooperate with the authorities. Once the official left, Chen said that his family advised him to leave home. Chen claims that he stayed with relatives in different places for several months before leaving for the United States on September 25, 1994.

5

Chen testified that he attended church regularly in the United States until 1999. He stated that he "lost his faith" because of the physical exhaustion from his long hours of work as a cook. During the first half of 2005, Chen estimated he went to church five or six times. After being detained by immigration authorities in June 2005, Chen said that he reevaluated his life and regained his faith.

The IJ denied Chen's asylum, withholding of deportation, and CAT protection application, making an adverse credibility determination and finding that Chen failed to establish relief eligibility.

The IJ first noted that because Chen filed his asylum application eleven years after entering the United States, he failed to satisfy the requirement that an asylum application be filed within one year of the applicant's last entry into the country. The IJ also determined that Chen had not demonstrated changed or extraordinary circumstances that would waive the one year requirement. The IJ found that Chen offered no testimony about any changes in China's policy towards religion relevant to his circumstances. In addition, the IJ also found that Chen's testimony that if he returned to China he would not be allowed to have another child was irrelevant to the one-year deadline and so did not justify waiver. The IJ observed that even if the child's birth did create changed circumstances, Chen still failed to comply with the filing requirement because his daughter was born nineteen months before he filed his asylum application.

The IJ did not believe Chen's testimony regarding the alleged rape. As support for this adverse credibility finding, the IJ noted that nobody was aware of the rape allegation

6

during the eleven years Chen was in the United States until it appeared in a handwritten addendum to his asylum application, and that Chen's stated reason for silence–that his former lawyer who filed the asylum application used a female interpreter–was insufficient, because Chen could have requested a male interpreter, but did not.[3]

The IJ in general found Chen not to be a credible witness. The IJ noted both that Chen's credibility was undermined by his admission that he lied about his age to the INS when he arrived in the United States, and that his testimony that he had been arrested twice in China was contradicted by his response in his application for permanent status that he had never been arrested anywhere. The IJ also commented that Chen's demeanor weighed against his credibility, observing that Chen gave his testimony "evasively, grudgingly, looking down the entire time."

The IJ found that Chen's story regarding his religious beliefs was inconsistent. Commenting on Chen's testimony that beginning in 1999 he "lost his faith" because of the time demands of his job, the Court found this "undercut" Chen's application and called into question "whether this [was] all true to begin with." Further, the IJ characterized as "haphazard[] and unconvincing[]" Chen's testimony regarding his claim that his faith had

---

[3]Chen asserts that the IJ was "disrespectful, hostile, and predisposed to discredit" him. This accusation is without merit. First, despite Chen's contention that the IJ must engage in a "nuanced psychological and cultural analysis of Mr. Chen's history" in order to believe his story, the IJ, relying on the record evidence, provided "specific, cogent" reasons why it did not believe Chen's story regarding the rape. Second, the tone of the IJ's questioning and oral opinion do not reveal a predisposed hostility to Chen's claims. Finally, Chen's remaining accusations regarding the IJ's alleged hostility to him basically boil down to the same issue–that the IJ did not interpret Chen's testimony in the way Chen wanted him to interpret it, not that the IJ's interpretation was without substantial support in the record. This claim is thus rejected.

7

been renewed since being in detention beginning in June 2005.  Moreover, the IJ found

Chen's knowledge of Christianity to be "not particularly impressive."

The IJ discounted Chen's testimony regarding his two arrests in China, observing that

his five months in detention would have allowed him enough time to memorize a story, and

noting that the affidavit of John Aird that Chen submitted in support of his application

indicated the ability of an individual to fabricate a claim.  *See* Affidavit of John Shields Aird,

App. 434, ¶ 16 ("Nearly everybody in China knows something about the family planning

program and most have some idea of how it is carried out.  An intelligent and well-informed

refugee from China could probably put together a fairly plausible story of past persecution

under the program without having endured any as long as he or she kept it simple and did not

exaggerate.").[4]

The IJ also found that Chen's story of being arrested in China for attending small

religious meetings of six people in a private home was inconsistent with a State Department

Report regarding religion in China.  That Report stated that "[u]registered churches are

illegal, but prayer meetings and Bible study groups held in homes are legal and generally are

not subject to registration requirements so long as they remain small and unobtrusive." (*See*

App. 252.)  The IJ noted that Chen claimed to have been arrested twice for attending the

---

[4]Although we are aware of the criticism of the Aird affidavit from the BIA, our Court, and other courts in recent years, *see*, *e.g., In re C–C–*, 23 I. & N. Dec. 899 (2006) (arguing against reliance on the Aird affidavit where petitioners for asylum contend they will be subject to forced abortion or sterilization upon return to China for having foreign-born children because Aird's affidavit in that regard was not based on personal knowledge but on documents from the 1980s and 1990s which conflict with more recent State Department reports), we are not citing the affidavit for the proposition for which it has been discredited.

8

small group meetings, not for handing out the pamphlets in public.

After finding Chen's testimony not to be credible, the IJ addressed the lack of corroborating testimony. The IJ noted that Chen's wife did not testify, although she attended the hearing and presumably could have provided helpful details. In addition, Chen did not call either of his sisters to testify, both of whom live in the United States. Neither did Chen call the pastor of the church in New York he said he attended; noting the geographic proximity of the church to the hearing and the serious implications of the hearing for Chen's future, the fact that the pastor was not present to testify on behalf of Chen's faith led the IJ to question whether the brief letter Chen submitted from the pastor was legitimate and whether Chen actually attended the church, as he testified.

Finally, with regard to Chen's "inchoate birth control policy claim," the IJ found it to be without merit because, first, the child would not have to go to China with Chen if Chen were removed, and second, the IJ noted that the documentary evidence indicated that in most rural settings in China, a second child is allowed if the first child is female and the couple desires a male child.

On May 1, 2006, the BIA affirmed the IJ's decision denying his asylum claim as untimely filed and denying his applications for withholding of removal and protection under the CAT.

The BIA found that Chen had failed to qualify for either of the exceptions to the one-year filing requirement. It determined that Chen's "emotional scars and shame" resulting from the alleged rape were not extraordinary circumstances because, first, he had been living

9

in the United States for over a decade, and second, he could have requested a male interpreter if he was uncomfortable telling his story to a female interpreter. The BIA also found that even if the birth of his daughter had constituted a changed circumstance, because Chen did not file his application for well over a year after she was born, his application was still filed out of time.

The BIA also upheld the IJ's adverse credibility determination. The BIA noted the IJ's observations regarding Chen's demeanor; Chen's use of "cursory" terms to describe the rape; his inconsistent stories regarding if he had been arrested; and the fact that his story was inconsistent with the State Department's 2004 International Religious Freedom Report. Although the BIA did not discuss all the IJ's reasons for its adverse credibility finding, it found the reasons stated "herein" to be sufficient to deem that finding not clearly erroneous. Accordingly, the BIA found Chen ineligible for withholding of removal because he failed to demonstrate a clear probability of religious persecution if returned to China. Finally, the BIA also found that Chen failed to establish that he would be tortured if returned to China, and so denied relief under the CAT.[5]

II.

---

[5]Although the BIA affirmed the IJ's denial of Chen's CAT application, Chen has not presented any argument challenging this denial. *See* Pet'r Br. 2, 15, 21, 44. Accordingly, he has waived the issue on appeal. *See Nagle v. Alspach*, 8 F.3d 141, 143 (3d Cir. 1993) ("When an issue is either not set forth in the statement of issues presented or not pursued in the argument section of the brief, the appellant has abandoned and waived that issue on appeal."); *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1066 (3d Cir. 1991) (noting that "a passing reference to an issue in a brief will not suffice to bring that issue before this court on appeal").

We lack jurisdiction to review Chen's challenge to the denial of his asylum application based on the determination of the IJ and the BIA that he filed it out of time, and that changed or extraordinary circumstances warranting waiver of the one-year filing deadline were absent. 8 U.S.C. §1158(a)(3); *Sukwanputra v. Gonzales*, 434 F.3d 627, 635 (3d Cir. 2006). We thus dismiss Chen's petition on that claim. Nevertheless, we do have jurisdiction, pursuant to 8 U.S.C. §1252, to consider Chen's challenge to the denial of his withholding of removal.

III.

We have jurisdiction over an appeal only from a *final* order of removal. *See* 8 U.S.C. § 1252(a). Where, as here, the BIA issued a decision on the merits, and did not adopt or invoke the IJ's factfinding or analysis, the BIA's decision is that final order. Our review is thus limited to the BIA's opinion, and does not extend to the IJ's. *See Voci v. v. Gonzales*, 409 F.3d 607, 613 (3d Cir. 2005) (noting that this Court will look to the IJ's opinion only in "situations in which the language of the BIA's opinion directly states that the BIA is deferring to the IJ, or invokes specific aspects of the IJ's analysis and factfinding in support of the BIA's conclusions").[6]

---

[6]Both the petitioner and the respondent urge us to review both the opinion of the BIA and the opinion of the IJ. However, neither offer any argument explaining why the BIA's opinion should not be considered a self-contained final order. After reviewing the BIA's opinion, we conclude that it alone is the final order, and that our jurisdiction does not extend to reviewing the IJ's opinion. *See Voci*, 409 F.3d at 613 & n.3 (commenting that the fact that a BIA opinion is short does not necessarily mean it is not the final order).

11

An alien may not be removed to a country if "the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). In order to qualify for such withholding of removal, the alien must show a "clear probability" of persecution upon return to that country, that is, that it is more likely than not that he will be persecuted if deported. *See Lin v. INS*, 238 F.3d 239, 244 (3d Cir. 2001). Because this is a more difficult standard to meet than the "well-founded fear" of persecution standard required for aliens seeking asylum, an alien who fails to demonstrate eligibility for asylum will necessarily fail to satisfy the standard for withholding of removal.

If an alien has suffered past persecution on the basis of any of the five enumerated grounds in the proposed country of removal, there is a presumption of future persecution if returned there. 8 C.F.R. § 208.16(b)(1).

We review the factual determination of whether an applicant has demonstrated a clear probability of future persecution under the substantial evidence standard. *Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002). The determination must be upheld if "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). By contrast, the BIA is not entitled to deference where its "findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record," *Dia v. Ashcroft*, 353 F.3d 228, 249 (3d Cir. 2003). The BIA's finding can be reversed only if the evidence is such that a reasonable factfinder would be compelled to conclude otherwise. *Elias-Zacarias*, 502 U.S. at 481.

12

In this case, the BIA found no clear error in the IJ's adverse credibility determination. *See* 8 C.F.R. § 1003.1(d)(3)(i). This finding is supported by substantial evidence. First, the BIA discussed the IJ's observations of Chen's demeanor while testifying, more specifically, the IJ's comments that Chen gave his testimony "evasively, grudgingly, looking down the entire time." *See Dia*, 353 F.3d at 252 n.23 (noting the "greater degree of deference" owed to the trier of fact's observations of demeanor, "especially where such inference is supported by specific and cogent reasons for doubting the veracity of the substance of the alien's testimony") (citations omitted).

Second, the BIA relied on the fact that Chen's description of his alleged 1993 rape was "cursory."

Third, the BIA commented that there was a material inconsistency between Chen's testimony that he had been arrested twice in China for unsanctioned religious activities, and the fact that on his earlier I-485 application for adjustment of status filed pursuant to his first marriage, he responded that he had never been arrested inside or outside of the United States.

Fourth, the BIA observed that Chen's story that he was arrested with five other people while participating in home church gatherings is inconsistent with information in the State Department's 2004 International Religious Freedom Report, which stated that the Chinese authorities were unlikely to interfere with home church meetings "so long as they remain small and unobtrusive."

In sum, the BIA's affirmance of the IJ's adverse credibility finding was supported by "reasonable, substantial, and probative evidence on the record considered as a whole," *Elias-*

13

*Zacarias*, 502 U.S. at 481. The BIA's review of the record reveals both internal inconsistencies in Chen's story (i.e., he either lied on his I-485 or on his withholding application about whether he has been arrested) and external inconsistencies (i.e., his story contradicts the State Department's Report), and further comments that Chen's mannerisms and terse language were not suggestive of veracity. These inconsistencies and observations go to the core of Chen's claim for withholding,[7] and we thus affirm the BIA's opinion in this regard.

Because we affirm the finding of adverse credibility as supported by substantial evidence, and because this finding specifically discounts Chen's story of religious persecution and, more specifically, the alleged rape, we affirm the BIA's conclusion that Chen has failed to show that it is more likely than not that he will be persecuted if returned to China and we will deny the petition for review.

## IV.

The petition is dismissed insofar as it challenges the denial of asylum, and it is denied insofar as it challenges the denial of withholding of removal.

---

[7]We recognize that an inconsistency does not have to go "to the heart of an applicant's claim" for it to be relevant to a credibility determination. *See* 8 U.S.C. § 1158(b)(1)(B)(iii).