NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2017 VT 28

No. 2015-184

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Bennington Unit, |
| | Criminal Division |
| | |
| Jeffrey Reed | May Term, 2016 |

David A. Howard, J.

Alexander Burke, Bennington County Deputy State's Attorney, Bennington, for
 Plaintiff-Appellee.

Matthew Valerio, Defender General, Rebecca Turner, Appellate Defender, and
 William Gardella, Law Clerk (On the Brief), Montpelier, for Defendant-Appellant.


PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.


¶ 1.  **DOOLEY, J.**  Defendant appeals from a judgment of conviction, based on a jury verdict, of knowingly giving false information to a law enforcement officer with the purpose of deflecting an investigation from himself, in violation of 13 V.S.A. § 1754(a).  Defendant contends the evidence was insufficient to support the verdict.  We reverse.

¶ 2.  The record evidence may be summarized as follows.  A witness testified that he was hunting at Kirby Hollow in Dorset on the morning of November 23, 2013, when he heard a gun shot and saw a deer fall about thirty yards away.  He did not see who fired the shot.  The witness testified that, shortly thereafter, an individual later identified as defendant came down the "blood trail" and "the first thing he said was, 'I'm going to have a heck of a time making this into a three pointer.' "  The witness told defendant that the deer was not legal and that he was going to

report it, and defendant responded that he would stay with the deer and "[s]ee if the two people that walked by this morning come over to claim the deer." The witness recalled that the deer did not have two points on one side, but "just a little nub." The witness then returned to the check station, called the State police, and waited for the game warden.

¶ 3. A State game warden testified that, on the morning of November 23, 2013, he responded to two telephone calls concerning the killing of a spikehorn deer[1] at Kirby Hollow in Dorset. The first call was from the witness who had observed the deer fall, and the second was from defendant, who also later called to report the deer. The warden arrived at a pull-off in Kirby Hollow at about 10:30 a.m. The deer in question was there along with four people: the witness, defendant, and defendant's father and uncle. The warden confirmed that the deer was a spikehorn: it had only two antlers, and no other points. The warden observed that the deer was not yet field dressed and noticed what he believed to be "a clear mark of where someone had cut, or hacked at . . . one of the antlers."

¶ 4. The warden spoke first with the witness and then defendant. The warden recalled that he told defendant that he was not under arrest and was free to leave and defendant said he had done nothing wrong and therefore was "fine" talking with the warden. The warden noted that the conversation with defendant lasted no more than five minutes, and that "[i]t was difficult to follow the progression of what [defendant] was saying." The warden asked defendant to return with him to where the deer fell, and defendant continued to recount what had occurred. According to the warden, defendant "kept changing what happened." Defendant said that he saw the deer, walked down to it, and spoke with the witness. Then he said that he heard a shot, sighted the deer through his scope, and had a discussion with the witness. He also said that he had returned to his normal

---

[1] A "spikehorn deer" is defined as a buck deer that is not a legal buck but which still has antlers at least three inches in length. See Vt. Admin. Code 16-4-128:3.5 (2013). A "legal buck" is defined as "[a]ny white-tailed deer with at least one antler with two or more antler points." Vt. Admin. Code 16-4-128:3.7 (2013). An "antler point" is defined as "an antler projection of at least 1" measured from base to tip." Vt. Admin. Code 16-4-128:3.6 (2013).

hunting spot—roughly thirty yards uphill from where the deer had fallen—before following the deer and meeting the witness. Defendant also initially mentioned seeing what he believed to be a father and son in camouflage in the woods but said nothing about seeing them again. Later, however, defendant told the officer that, while waiting with the deer after the witness left to call the police, an individual in camouflage walked up, looked at the deer, and walked away.

¶ 5. The warden testified that he asked defendant about the deer's antlers. Defendant at first said he did not know "how they got cut off" but then "maybe even blamed [the witness]." He then indicated that he "would admit to the antler point," explaining that he had "laid [a one-inch knife blade] on the antler point, and the antler point fell off." Defendant did not say where the broken antler tip went, but he walked over to where the deer had been lying and "rustled around in the leaves a little bit" without finding anything. The warden acknowledged that it was not possible for a deer antler to break off "simply by laying a piece of metal against it."

¶ 6. The warden then inspected defendant's gun; he smelled gunpowder and observed gunpowder residue in its chamber. Defendant told the warden that he had fired the gun the night before but not on that day. Defendant also offered one of the bullets he was using that day; it did not match the bullet later recovered from the deer. Back at the pull-off, the deputy game warden inspected the guns belonging to defendant's father and uncle and observed that they had not been fired recently.

¶ 7. After informing defendant that he was free to leave, the warden and his deputy returned to the spot where the deer had fallen and noticed two "brown plastic shopping bag[s]" tied to trees. Just below those bags were salt licks. The first was roughly five to ten yards from the spot where the deer had fallen and the second was roughly thirty yards from defendant's normal hunting spot. In a follow-up conversation with defendant several weeks later, defendant told the warden that the salt lick "wasn't anything to him." The warden also asked defendant how often he hunted in the area. Defendant initially responded that he had hunted there numerous times but

later said he had hunted there only on two or three occasions some weeks before the deer was shot. Defendant later mentioned that there had been a lot of deer in Kirby Hollow the day before the deer was shot.

¶ 8.    The State charged defendant with three offenses: (1) a violation of 13 V.S.A. § 1754(a) by knowingly giving false information to a law enforcement officer with the purpose of deflecting an investigation from himself; (2) a violation of 10 V.S.A. § 4747 by taking big game by the aid of a salt lick; and (3) a violation of 10 V.S.A. § 4781 by possessing big game taken by an illegal device, in this case a salt lick. The charging information for the first count contained only the statutory language. The warden's supporting affidavit stated that "defendant kept adding and changing facts" and "changing pieces of the story" but did not otherwise specify which information he gave the officer was false and intended to deflect the investigation from himself.

¶ 9.    At the close of the State's case, defendant moved for judgment of acquittal, arguing that "as much as the State wants to say that it's three different stories . . . it could all be part of the same story [and] . . . is not internally inconsistent." The State maintained that defendant "simply gave false information to deflect the investigation, and he gave multiple stories about what had occurred." The court denied the motion. The defense presented no additional evidence. In its closing argument, the State emphasized that defendant "told multiple versions" of what he did immediately after the deer was shot, of what took place after the witness left to call the warden, of how the cut marks appeared on the antlers, and of how frequently he had hunted in the area. The only specific statements that the prosecutor expressly characterized as false, however, were those concerning the antlers, which he also asserted were made "to deflect the investigation because that was an illegal buck."[2] The jury found defendant guilty of the first count and not guilty of the other two. The court later sentenced defendant to a $300 fine. This appeal followed.

_____

[2] The prosecutor argued in this regard as follows:

4

¶ 10. Defendant contends the evidence was insufficient to demonstrate that he made a knowingly false statement with the purpose of deflecting the investigation from himself. "We review de novo a motion for judgment of acquittal." State v. Vuley, 2013 VT 9, ¶ 30, 193 Vt. 622, 70 A.3d 940. The question on appeal is whether the State's evidence could fairly and reasonably support a jury finding of guilt beyond a reasonable doubt. Id. Because we cannot know which of the three inconsistent statements presented by the State the jury found knowingly false, or whether all jurors found the same statement or statements knowingly false, we can affirm defendant's conviction only if every statement meets each element of the statute. In this case, none of the three inconsistent statements satisfies the last statutory element.

¶ 11. We begin with two preliminary points concerning the statutory wording and the specific theory on which the case against defendant was tried.

¶ 12. First, defendant was convicted of violating 13 V.S.A. § 1754(a), a misdemeanor with a maximum punishment of a year in jail or a $1000 fine or both. The statute provides:

> (a) A person who knowingly gives false information to any law enforcement officer with purpose to implicate another or deflect an investigation from the person or another person shall be imprisoned for not more than one year or fined not more than $1,000 or both.

In this case, defendant was charged with giving false information to a law enforcement officer with the purpose of deflecting an investigation from himself, one of the two alternative mental elements in the statute—the other being an intent to implicate another person. In State v. Albarelli, 2016 VT 119, ¶ 33, __ Vt. __, __ A.3d __, we explained that the statute contains three essential

---

But even more importantly than these stories about where he was going what he saw, whether he saw it through his scope, whether he went to his bucket or not was the false information he gave about the antlers. He first said that he had no idea what happened. The[n] he said [the witness] did it. Then he said well, I put this knife against it, and it fell off. All of those are false information.

5

elements: (1) knowingly giving false information, (2) to a law enforcement officer, (3) with the purpose to deflect an investigation from the person or another. This case is about the third element.

¶ 13. Application of the statute to the facts of this case begins with the charge. As noted, the information recited only the statutory language, relying upon the supporting affidavit of the warden to provide the necessary factual allegations. See V.R.Cr.P. 7(b) (stating information must contain "essential facts constituting the offense charged"); State v. Brown, 153 Vt. 263, 272, 571 A.2d 643, 648 (1989) (noting that to determine information is sufficient it must be read with affidavit). The affidavit did not specify which statements given by defendant were false. It stated that defendant "changed his story a number of times and it was difficult to follow," "kept adding and changing facts," "kept changing pieces of the story," and noted that one statement during a final interview "was different than what he had just told us less than [ten] minutes before and also different than when we first met him at the scene."

¶ 14. The State's evidence, consisting largely of the warden's testimony, was consistent with the affidavit, again providing no specific identification of what information the State claimed was false. The prosecutor's closing argument to the jury amplified that testimony, enumerating five subject areas of inconsistency. In addition, the prosecutor identified for the first time what was allegedly false, characterizing all of the defendant's statements concerning the antlers as "false information."[3] The ensuing jury instructions gave no explanation about how the jury was to determine whether defendant gave false information. They did not say, for example, whether the jury could find that any of the statements given to the warden would meet the element. The instructions did not say that the statement must relate to the antlers. Nor did they specify which of defendant's statements with respect to the antlers the jury must find was false.

---

[3] See supra, ¶ 9 n.2. As noted, the prosecutor argued that defendant gave three different explanations about the cut marks on the antlers: (1) he did not know what happened; (2) the witness may have been responsible; and (3) the nub fell off when he laid his knife against it.

6

¶ 15. Second, the statute does not assign criminal responsibility to "inconsistent" statements to law enforcement officers. Instead, it assigns criminal responsibility to knowingly false statements. It is entirely possible that two statements made by the same person can be inconsistent without either being knowingly false, and, as the prosecutor essentially argued, two statements can be inconsistent with both being false. Our pleading rules require the State to present the essential facts that show each element of the crime was met, see V.R.Cr.P. 7(b), but the State failed to do so with respect to the element of a knowingly false statement. The affidavit supported the State's claim that the statements were inconsistent but failed to show which, if any, was false.

¶ 16. As we have stated on numerous occasions, this error becomes one of constitutional magnitude if a case is presented to the jury with multiple possible statements meeting an element of the offense and no specification of which statement all the jurors must find was knowingly false. As we explained in State v. Gilman:

> Defendant correctly cites the general rule that where there is evidence of more than one act that would constitute the offense charged, the State must specify the act for which it seeks a conviction. The required election protects the defendant from the possibility that part of the jury will base its decision to convict on evidence of conduct different from that considered by the rest of the jury. Such a decision would deprive the defendant of his right to a unanimous verdict based on a single offense.

158 Vt. 210, 215, 608 A.2d 660, 664 (1992) (citations omitted). This requirement was clearly violated here.

¶ 17. Although the above is primarily context because defendant has not challenged the jury's verdict on this ground, context is important because of its impact on the argument that is preserved and raised here. The deficiency is in the knowingly-false-information element, but it carries over into the purpose element. Even if we look only at the statements identified by the prosecutor in closing argument as false[4]—that is, the statements with respect to the antlers—there

---

[4] Of course, we cannot look only at the statements about the antler in view of the way the case was charged and presented. In the absence of instructions to the contrary, any juror could

are statutory construction issues with respect to the deflection element for each of them. Because we do not know what statement any particular juror found to be knowingly false, we can affirm only if we can conclude that the deflection element is met with respect to all of the statements. The record here does not allow such a conclusion.

¶ 18.    The most obvious problem is with the second statement—that the witness broke off the antler piece. This statement may appear to support the element that defendant acted to deflect the investigation from him because he blamed another person. But the statement directly and explicitly invokes the alternative purpose element in the statute that defendant intended "to implicate another," an element the State did not charge. Unless we construe the statute as allowing the State to prosecute a person twice, under each with an alternative purpose element, we cannot affirm a conviction for acting to implicate another under the deflection element. As discussed more fully below, this is not construction consistent with the legislative history.[5]

¶ 19.    Looking at the other two statements starts with the general principles of statutory construction and their application to this statute.

---

conclude that the false statement was some other statement testified to by the warden as part of his opinion that defendant continually made inconsistent statements. For example, the warden reported that in one version of the events defendant stated that ten minutes after the deer died he saw an unknown person in a camouflage suit walk up to the deer and then walk away. He also reported that defendant said he had not fired his gun on the day in question. Any juror could have believed that either or both of these statements knowingly conveyed false information and grounded his or her conviction vote on that statement.

We have addressed only the statements with respect to the antler because these demonstrate without further analysis why the conviction cannot be affirmed.

[5]  It is important to recognize that the statement attributing responsibility for the broken antler to the witness was the one that at least some jurors are most likely to have found to be false and made for the purpose of deflecting the investigation because it fit most easily within the common meaning of deflect, as discussed below. The jury was not told, of course, that there was an alternative mental element that directly fit the facts—giving a false statement with the purpose of implicating another—but defendant was not charged under that element, and as discussed below, the legislative history does not show that the two purpose elements are interchangeable. The intent was to broaden the scope of the statute not to create double liability for instances where defendant's purpose is to implicate another.

¶ 20.  When interpreting a statute, this Court's goal is to implement the intent of the Legislature by giving effect to the plain language of the statute.  State v. Villeneuve, 2016 VT 80, ¶ 5, __ Vt. __, 150 A.3d 622.  When the language of the statute is ambiguous, however, the Court may look elsewhere to determine the legislative intent in order to provide a fair and reasonable construction of the statute.  Town of Milton Bd. of Health v. Brisson, 2016 VT 56, ¶ 21, __ Vt. __, 147 A.3d 990.  Testimony given to a committee of the Legislature may provide some clues as to the purpose of the amended statute.

¶ 21.  The legislative history of the statute shows that the original version applied only where the defendant had a purpose to "implicate another."  1971, No. 169 (Adj. Sess.), § 4.  In 2006, the statute was amended to add the deflection language relied upon in this case.  See 2005, No. 149, (Adj. Sess.), § 1.  In the judiciary committees to which the bill was referred, members of the Legislature were unclear on what the language of the amendment meant, with members of the Senate Judiciary Committee noting that "we need to find out what that means" in a hearing prior to the committee approval of the bill.  Hearing on S.0186 Before S. Comm. on Jud., 2005-2006 Bien. Sess., CD No. 06-51, min. 00:00–01:00 (Feb. 6, 2006).[6]  However, the bill was passed in the Senate with no changes to the "deflect" language, providing no further insight into its meaning.

¶ 22.  In testimony to the House Committee on the Judiciary on April 6, 2006, Jane Woodruff, Executive Director of the Department of State's Attorneys and Sheriffs, stated that she had provided the language to add to the preexisting statute in order to resolve a "loophole."  Hearing on S.0186 Before H. Comm. on Jud., 2005-2006 Bien. Sess., CD No. 06-104, track 2, min. 15:00–16:00 (April 6, 2006).  Previously, the statute had required that another individual be

---

[6] Two of five tapes of the testimony and discussions about the bill in the House and Senate Judiciary Committees are available, and excerpts are quoted in the text.  Three of the tapes, from other days, ostensibly exist but contain no recorded content.  Of course, reviewing only part of the testimony and discussion creates a risk of misinterpretation, and we acknowledge the risk.  We have used the testimony of the drafter of the bill in the House Judiciary Committee because it is likely to be the most relevant.

implicated, yet "you can lie to police without implicating other people . . . what subsection b is getting to is the wasted resources" spent on false statements. Id. at 22:00–23:00. Woodruff generally characterized subsection b as "lying to the police," additionally using the example of a person who knows that there is a warrant for their arrest and, when stopped by an officer, gives a false name—under the old version of the statute, such a falsehood would not be criminal, but under the amended statute would amount to a "deflection" of the investigation. Id. at 14:00–15:00. While Ms. Woodruff said that the broader statutory language was necessary to fix this loophole, she noted concerns that this statute could be used to penalize individuals who wish to recant or retract statements, indicating that the statute was intended to cover only a narrow spectrum of lies hindering law enforcement. Id. at 10:00–12:00.

¶ 23. By using the word "deflect," the statute has been worded more narrowly than similar statutes in other jurisdictions that prohibit lies to police or other governmental officials. The comparable federal statute and similar state statutes are broader in their reach. For example, the federal statute criminalizes, with respect to a matter within the jurisdiction of a branch of government, the conduct of a person who knowingly and willfully "makes any materially false, fictitious, or fraudulent statement or representation." 18 U.S.C. § 1001(a)(2); see Brogan v. United States, 522 U.S. 398, 408 (1998) (holding denial of guilt violates statute). The Washington and Ohio statutes are similarly broad. See Wash. Rev. Code Ann. § 9A.76.175 (West 2001) (criminalizing "knowingly [making] a false or misleading material statement to a public servant"); Ohio Rev. Code Ann. § 2921.32(A)(5) (stating it is crime to "with purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of another for crime . . . communicate false information to any person"). We have found no other statute as narrowly drawn as Vermont's. Obviously, if the Legislature had intended the statute to cover any lie of material fact to a police officer or state official, it could have accomplished that objective by eliminating the narrowing circumstance of implicating another instead of adding another narrowing circumstance of

deflecting the investigation. Moreover, if it intended the broad effect, it had many language models it could employ.

¶ 24. Merriam-Webster defines "deflect" as "to turn (something) aside especially from a straight course or fixed direction", Merriam–Webster Online Dictionary, http://www.merriam-webster.com/dictionary/deflect [https://perma.cc/THQ5-ZQ7V], meaning that the statute criminalizes not merely a knowing lie that affects an investigation, but a knowing lie affecting an investigation that is intended to turn the investigation away from the person making the statement. The closest case that we have found to this one is Commonwealth v. Morse, 10 N.E.3d 1109 (Mass. 2014), which interpreted a statute that punishes a person who (1) willfully misleads (2) a police officer (3) with the intent to impede, obstruct, delay, harm, punish, or otherwise interfere thereby with a criminal investigation. Mass. Gen. Laws ch. 268, § 13B(1)(c) (2010). The Massachusetts Supreme Judicial Court interpreted this statute as criminalizing "a knowing or intentional act calculated to lead another person astray." Morse, 10 N.E.3d at 1117. The court held that the statute did not apply to a defendant who denied he had committed the criminal conduct:

> Here, however, there was no evidence of affirmative misdirection on the defendant's part. The defendant's statement, the simple word "no," was an exculpatory denial, not a content-laden fabrication designed to send police off course, thereby interfering with their investigation. After this negative response, police were in the same position they would have been in had the defendant instead remained silent.

Id. at 1119.

¶ 25. A narrow interpretation consistent with the dictionary definition of "deflect" and with Morse is reflected in our previous decisions regarding the statute. In Albarelli, 2016 VT 119, ¶ 37, we affirmed the trial court's decision that a defendant who gave a false name when arrested had "intent to deflect the investigation." We held that the statutory language is "one clause explaining the action necessary to violate [the statute]," the three elements are joined and cannot

"be checked off individually." Id. ¶ 33. The statute requires more than giving false information: "it requires the giving of false information <u>with</u> the intent to deflect the investigation." Id. ¶ 41.

¶ 26. Similarly, in <u>State v. Delaoz</u>, 2010 VT 65, ¶ 30, 189 Vt. 385, 22 A.2d 388, a defendant who was found to have secreted a handcuff key in his shoe was held to have intended to deflect, as it indicated that he "had taken steps to avoid prosecution and punishment." Neither of these cases involved lies or misstatements about whether the defendant committed the crime being investigated. They involved attempts to avoid apprehension and conviction even though the defendant was guilty of the crime.

¶ 27. With these points in mind we return to the remaining statements by defendant concerning the antlers that the State claims were sufficient to support the conviction. In summary, these statements were essentially: I don't know what happened to the antler and I do know what happened to the antler; it fell off when I laid a knife on it. In addressing the argument here, it is well to recall that making inconsistent statements is not an element of the crime. The question properly considered is whether, if the jury finds each of the statements to be false, can it also find that each statement was made for the purpose of deflecting an investigation. Neither of the statements is sufficient to meet the purpose element.

¶ 28. The first statement is the equivalent of the word "no" in the <u>Morse</u> case described above. Saying no, or its equivalent, to an incriminatory question in no way deflects the investigation. As the <u>Morse</u> court stated, the statement "was an exculpatory denial, not a content-laden fabrication designed to send police off course, thereby interfering with their investigation" and, "[a]fter this negative response, police were in the same position they would have been in had the defendant instead remained silent." <u>Morse</u>, 10 N.E.3d at 1119.

¶ 29. The dissent takes issue with our reading of <u>Morse</u> on this point but, in doing so, it misunderstands the <u>Morse</u> court's holding and disavows its own definition of "deflect." First, the dissent agrees with us that "the Legislature's use of the term 'deflect' was intended to criminalize

12

'not merely a knowing lie that affects an investigation, but a knowing lie affecting an investigation that is intended to turn the investigation <u>away from the person making the statement</u>.' " <u>Post</u>, ¶ 40. But then the dissent makes much of the <u>Morse</u> court's interpretation of misleading acts as those "malicious acts calculated to produce certain effects on a third party"—acts that induce third party action rather than simply exculpatory acts. <u>Post</u>, ¶¶ 44-45. We agree with this characterization of <u>Morse</u>, but disagree that this in any way distinguishes the statute at issue in <u>Morse</u> from the statute at issue here. The dissent characterizes our definition of "deflect" as "squarely aligned with" exculpatory acts but, by our definition of deflect, which the dissent expressly adopts, a deflecting action is one that "turn[s] the investigation away from the person making the statement." It would be illogical to conclude that an investigation might be turned away without some action by a third party and thus, our definition, like the <u>Morse</u> definition of "misleads," is limited to those acts that induce third party action—not merely exculpatory acts. Because a denial of culpability does not prompt any particular, discrete action by a third party, but simply leaves the third party in the same position they would occupy if no statement was given, the denial neither deflects nor misleads.

¶ 30.    Further, even if the statement met the purpose element, the case would rest on an interpretation of the statute that Jane Woodruff testified was not intended—automatically criminalizing an earlier denial if it is later retracted. No person who ever denied knowledge about a fact or event could ever admit to having knowledge without risking prosecution for a crime. Here, the presence of the second statement admitting some responsibility for the antler is de facto a retraction of the first statement.[7]

¶ 31.    Finally, if a denial is a deflection, it essentially reads the requirement of a deflection purpose out of the statute. Every false statement to an officer during an investigation would

---

[7]    It very likely that the jury found that this statement was false because, except for a situation in which the declarant was protecting someone else, not the situation here, a declaration of lack of knowledge, followed by an admission to knowledge that might be inculpatory, is virtually always false.

automatically be a deflection if the information had any relation to the investigation. The dissent posits a question on this point: "Where the defendant is the subject of a criminal investigation and makes a false statement directly to a police officer conducting the investigation, then what reason is there for the false statement if not to deflect the investigation?" Post, ¶ 50. But even this question reads the deflection requirement out of this statute. The dissent would have us decide that all relevant false statements are necessarily deflections. Were we to go this far, not only would we render surplusage language that the Legislature saw fit to include in this statute, but we would also take away the jury's proper role in determining whether an isolated statement is both knowingly false and a deflection. This result seems contrary to the dissent's argument that a jury's role is to determine "whether a defendant knowingly gave false information and with the purpose to turn the investigation away from the person making the statement." Post, ¶ 51.

¶ 32. As for defendant's statement admitting to removing the antler nub with a knife, even if found to be false, it is inconsequential to the alleged crime. The crime is based on the communication of false information with the purpose of deflecting an investigation, not on tampering with potential evidence. The fact that defendant may have attempted to sever a piece of the antlers is relevant to guilt because it made it difficult to determine how large the antlers were when the deer was killed. But the manipulation of the antlers is not the basis of the crime; instead, it is the statement of defendant about the antlers that forms the basis of the crime. The statement itself is both unbelievable and inconsequential. Indeed, in his affidavit accompanying the information in this case, the investigating warden stated that on hearing defendant's explanation of how a piece of the antler was taken off, "I advised the defendant that that was the most ridiculous thing I had ever heard." If anything, defendant's statement was evidence of guilt. The fact that the antler fell off because defendant put his knife on it, rather than because he cut it off with the knife, could not be the basis for deflecting an investigation. If that statement had been specified as the "false" information, the jury verdict would not have been supported by the evidence.

14

¶ 33.    To summarize, under the circumstances of this case, we must find that all of the statements that a juror could have found to be false were made with the purpose of deflecting the investigation. As discussed, we cannot conclude that all of the statements met that element of the offense. Accordingly, we cannot sustain the judgment.

¶ 34.    In concluding, it is worth noting the danger that would inhere in a broader reading of the statute. Here, the most serious crime for which defendant was charged was that he violated 13 V.S.A. § 1754(a), not that he shot and killed an immature deer, a charge of which he was acquitted. If we were to construe § 1754(a) too broadly, we would send the message that misdemeanor prosecutions can be based on violations of § 1754(a) rather than on the underlying crime and that deficiencies in the investigation or the evidence could be rectified by criminalizing a defendant's denials of responsibility. This is not the purpose of the statute or the proper message to send.

Reversed.

FOR THE COURT:

_____

Associate Justice

¶ 35.    **REIBER, C.J., dissenting.**   I dissent because I disagree both with the majority's interpretation of the term "deflect" in 13 V.S.A. § 1754(a) and with the majority's determination that there was not sufficient evidence that defendant's statements were knowingly false or that he made the statements with the purpose of deflecting the investigation from himself. I would therefore affirm defendant's conviction under § 1754(a).

¶ 36.    The majority correctly observes that under § 1754(a), the crime of giving false information to a law enforcement officer with the purpose of deflecting an investigation contains three essential elements: (1) knowingly giving false information, (2) to a law enforcement officer, and (3) with the purpose to deflect an investigation from the person or another. State v. Albarelli,

15

2016 VT 119, ¶ 33, __ Vt. __, __ A.3d __. As the majority also correctly observes, "[t]his case is about the third element." Ante, ¶ 12. The problem with the majority's opinion, however, is that it then inexplicably focuses on the first element rather than the third. And it does so despite the fact that defendant has not challenged that he knowingly gave false information.

¶ 37. The end result of the majority's interpretation of the statute is that it effectively adds a fourth element to 13 V.S.A. § 1754(a): the jury not only must find that a defendant knowingly gave false information to a law enforcement officer with the intent to deflect, but it also must determine the true sequence of events about which the defendant is lying. Put differently, the majority reads into the statute a requirement that the jury make a baseline finding against which it can compare a defendant's statement to ensure that the defendant's statement to law enforcement was both knowingly false and intended to deflect an investigation. That reading of the statute is inconsistent not only with the plain language of the statute but also with its legislative intent.

¶ 38. I begin my analysis of § 1754(a) with its legislative history. Section 1754(a) was originally based on a subsection of Model Penal Code § 241.5. That code provision, entitled "False Reports to Law Enforcement Authorities," reads:

> (1) Falsely Incriminating Another. A person who knowingly gives false information to any law enforcement officer with purpose to implicate another commits a misdemeanor.

Model Penal Code § 241.5. The original version of § 1754(a), adopted in 1971, closely tracked the Model Penal Code language:

> A person who knowingly gives false information to any law enforcement officer with purpose to implicate another shall be imprisoned for not more than one year or fined not more than $1,000.00 or both.

1971, No. 169 (Adj. Sess.), § 4. Therefore, like Model Penal Code § 241.5, the original version of § 1754(a) applied only where the defendant had a purpose to "implicate another." Id. But in 2006, the Legislature added the language "to deflect an investigation from the person or another person" to the statute. See 2005, No. 149, (Adj. Sess.), § 1. As the majority decision

16

acknowledges, ante, ¶ 22, this addition necessarily broadened the statute by criminalizing both the giving of false information to law enforcement officers in order to implicate another or the giving of false information to law enforcement officers in an attempt to deflect an investigation.

¶ 39. Further analysis of § 1754(a) requires construction of two of the key terms of § 1754(a): "deflect" and "investigation." See State v. Villeneuve, 2016 VT 80, ¶ 5, __ Vt. __, 150 A.3d 622 ("When interpreting a statute, this Court's goal is to effectuate the intent of the Legislature by first looking to the plain, ordinary meaning of the statute."); see also In re Vermont Nat. Bank, 157 Vt. 306, 313, 597 A.2d 317, 320 (1991) ("The use of the dictionary is an accepted way to arrive at the meaning of [] language."). "Deflect" means "to turn (something) aside especially from a straight course or fixed direction." Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/deflect [https://perma.cc/THQ5-ZQ7V]. "Investigate" means "to observe or study by close examination and systematic inquiry" or "to conduct an official inquiry." Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/investigate [https://perma.cc/Z7LV-54UR]. An investigation need not be formal; one exists wherever a law enforcement officer tries to determine what happened regarding a potential crime. The Ninth Circuit has applied the terms "deflect" and "investigate" in a manner that is consistent with these dictionary definitions. See United States v. Foreman, 926 F.2d 792, 795 (9th Cir. 1990) (describing police officer's questioning of defendant as "investigation" and upholding district court's finding that defendant showed her police badge to investigating officers to "deflect police questioning").

¶ 40. With these definitions in mind, I completely agree with the majority when it writes that the Legislature's use of the term "deflect" was intended to criminalize "not merely a knowing lie that affects an investigation, but a knowing lie affecting an investigation that is intended to turn the investigation away from the person making the statement." Ante, ¶ 24. What I do not agree with is the majority's narrowing of the statute's scope and application.

17

¶ 41. The majority does so first through its misplaced reliance on the testimony of Jane Woodruff as evidence of the Legislature's intent to "cover only a narrow spectrum of lies hindering law enforcement." Ante, ¶ 22. Instead of attempting to ascertain the objective meaning of the statutory language by reference to familiar tools of statutory interpretation, the majority bases its reading of the law on Attorney Woodruff's opinion that the amendment might be interpreted more broadly than she intended and might be used to penalize individuals who wish to recant or retract statements. See ante, ¶ 22.

¶ 42. Simply put, our goal in reviewing legislative history is not to give force to the subjective intentions of the proponent of a bill. Instead, "we should gather legislative intent from a consideration of the whole and every part of the statute, the subject matter, the effects and consequences, and the reason and spirit of the law" from the objective perspective of the legislative body that collectively endorsed the statute at issue. See Herrick v. Town of Marlboro, 173 Vt. 170, 173, 789 A.2d 915, 917-18 (2001) (quotation omitted). If we accept as true the U.S. Supreme Court's observation that "established rule[s] of statutory interpretation cannot be overcome by judicial speculation as to the subjective intent of various legislators" in enacting particular legislation, certainly we must also accept that when other tools of statutory interpretation are available, we ought not rely on judicial speculation about the subjective intent of an executive branch official in proposing particular legislation. See Bilski v. Kappos, 561 U.S. 593, 608 (2010); see also Doe v. Pataki, 120 F.3d 1263, 1277 (2d Cir. 1997) ("We therefore decline to construe the subjective intent expressed by one or more legislators to reflect the objective intent of the legislature." (quotation omitted)).

¶ 43. Additionally, I cannot agree with the majority's reliance on Commonwealth v. Morse, 10 N.E.3d 1109 (Mass. 2014), for further clarification of the term "deflect." The majority's use of that case as a prism through which to understand § 1754(a) is seriously misguided for several reasons. Unlike here, the statute in that case—Mass. Gen. Laws ch. 268, § 13B(1)(c) (2010)—

18

largely targets "[i]ntimidation of witnesses, jurors and persons furnishing information in connection with criminal proceedings." As the court in <u>Morse</u> explained, "the statute under which the defendant in this case was convicted of misleading a police officer . . . has been enlarged since its enactment . . . but is still fundamentally a <u>witness intimidation statute</u>." <u>Morse</u>, 10 N.E.3d at 1114 (citation omitted) (emphasis added). Section 1754(a), on the other hand, is <u>not</u> fundamentally a witness intimidation statute—it is a statute that targets lying to the police. Moreover, the statute in <u>Morse</u> does not even include the term "deflect," and this term is the lynchpin of the case against defendant.[8]

¶ 44.    The Massachusetts statute also criminalizes threats and attempts to cause injury or property damage, conveying of gifts, and promises of anything of value to, among others, witnesses, persons with information related to a violation of a criminal statute, and persons attending or intending to attend civil or criminal proceedings. Mass. Gen. Laws ch. 268, § 13B(1). This broader language is consistent with the fundamental purpose of the statute, as noted by the <u>Morse</u> court. And while the majority here equates the Massachusetts term "misleads" with our term "deflect," it is important to note that the <u>Morse</u> court imputed a meaning to "misleads" that would be completely incongruous with how we should interpret "deflect": it observed that the term "misleads" appears in the statute in a list that includes the terms "intimidate" and "harass," and reasoned that an understanding of "misleads" should also be focused on "malicious acts calculated to produce certain effects on a third party." <u>Morse</u>, 10 N.E.3d at 1114.

---

[8] The relevant language at issue in <u>Morse</u> states:

> Whoever, directly or indirectly, willfully . . . <u>misleads</u>, intimidates or harasses another person who is . . . a judge, juror, grand juror, prosecutor, <u>police officer</u>, federal agent, investigator, defense attorney, clerk, court officer, probation officer or parole officer . . . shall be punished by imprisonment . . . .

Mass. Gen. Laws ch. 268, § 13B(1) (emphasis added).

19

¶ 45.  The Morse court concluded its analysis of the Massachusetts statute by specifically interpreting "misleads" in the context of criminalizing "inducing action by someone else," not in the context of criminalizing "exculpating [one]self from liability."  Id. at 1119.  It rejected the notion that defendant's denial of consuming "substances that could've impaired [his] ability to . . . be aware of what was going on around [him]" could fall under this understanding of "misleads":

> [W]hen an individual denies his guilt, either falsely or truthfully, without otherwise making any affirmative misrepresentations or attempting to shift the blame onto a third party, it generally would be in aid of exculpating himself from liability, rather than of inducing action by someone else.  As such, the relationship of [exculpating oneself from liability] to the fundamental anti-witness-intimidation purpose of § 13B is at best attenuated.

Id.  This distinction is relevant because "a knowing lie affecting an investigation that is intended to turn the investigation away from the person making the statement," ante, ¶ 24, is squarely aligned with "exculpating oneself from liability," not with "inducing action by someone else." Morse at 1119.

¶ 46.  In light of the profound differences in structure, intent, and legislative history between the Massachusetts statute and § 1754(a), Morse should have no application to the case before this Court.  Section 1754(a) is a relatively new law, and this Court's interpretation of it here will have great effect on its application going forward.  That interpretation should not be based on so different a statute, one whose meaning—as the Massachusetts court noted—is foundationally inconsistent with the meaning and intent of § 1754(a).

¶ 47.  Finally, and most fundamentally, I take issue with the majority's focus on the inaccuracies in defendant's statements to police—which relate to the first element of the charged crime—rather than on defendant's purpose in making those statements—which bears on the third element of the charged crime and the only element that is at issue in this case.  Specifically, the majority begins its analysis by criticizing the State's argument at trial for emphasizing without

specifically isolating "five subject areas of inconsistency." Ante, ¶ 14. According to the majority, then, the error in this case stems not from the State's failure to provide sufficient evidence that defendant intended to deflect an investigation away from himself, but instead from a failure of the jury charge to require the jury to unanimously identify which statements it found to be knowingly false. Ante, ¶¶ 14-17. Even as it acknowledges that only the third element—deflection—was actually preserved and raised in this appeal, the majority bases its decision on the first element because, the majority claims, error in any element "carries over into the purpose element." Ante, ¶ 17. This reasoning is flawed.

¶ 48. By the majority's interpretation, any prosecution under § 1754(a) would require the court to give a jury instruction that demanded that the jury find (1) that the defendant had done some set of actions—in this case, had committed the crimes of which he was ultimately acquitted—and (2) that the defendant knowingly told a law enforcement officer that he or she did something other than that set of actions. This outcome follows from the majority's reasoning, which complains that there would be a constitutional defect in charging a defendant under this statute if the basis of the charge was that the defendant made inconsistent statements. See ante, ¶ 15-16. I cannot agree with this reading of the statute. The language of the statute as it is written requires only that a defendant have knowingly made a false statement to a law enforcement officer with the intention to deflect an investigation.

¶ 49. One way to establish the elements of this crime could be to rely on the jury's finding that a defendant is guilty of a crime and then to establish that the defendant told a police officer that he or she had not done the acts that form the elements of the charged crime. This is the method that the majority seems to push for exclusively. But another way to establish the elements of § 1754(a), would be to prove that a defendant made two sets of statements that are so logically inconsistent with each other that the jury could conclude that at least one of those statements must be false. As long as the prosecution could also show that the defendant's false statement—

21

regardless of which of the statements the jury believes to be false—was intended to deflect an investigation, the statute as it is written permits the jury to convict. The majority decision says the opposite.

¶ 50. For example, the majority narrows the scope of "deflect," writing that "if a denial is a deflection, it essentially reads the requirement of a deflection purpose out of the statute. Every false statement to an officer during an investigation is automatically a deflection if the information has any relation to the investigation." Ante, ¶ 31. The majority strongly suggests, then, that a denial, by its nature, cannot be a deflection. As I view it, this is creating a distinction without a difference. Where the defendant is the subject of a criminal investigation and makes a false statement directly to a police officer conducting the investigation, then what reason is there for the false statement if not to deflect the investigation?

¶ 51. Indeed, a denial is not incongruous with the majority's own understanding of the statute as criminalizing a "knowing lie affecting an investigation that is intended to turn the investigation away from the person making the statement." Ante, ¶ 24. Again, without getting into hypotheticals, I think it is amply clear that juries could reasonably find that some denials are deflections and some are not. Juries could also reasonably find that some false statements that have a relation to the investigation nevertheless are not deflections, but others are. The fact of the matter is that it is up to the jury as the factfinder to determine whether a defendant knowingly gave false information and with the purpose to turn the investigation away from the person making the statement. It is the jury that is in the best position to compare statements, to assess witness credibility, and to place allegedly false information in context. See State v. Neisner, 2010 VT 112, ¶ 17, 189 Vt. 160, 16 A.3d 597. We should not interfere with this role by putting arbitrary qualifiers on what kinds of statements can count as deflections.

¶ 52. The facts of this case illustrate the flaws in the majority's reasoning. As written, the statute proscribes knowingly giving "false information" to a law enforcement officer for the

purpose of "deflect[ing] an investigation." 13 V.S.A. § 1754(a). And defendant's statements and the circumstances around those statements show that defendant necessarily must have given false information to the warden. The warden's affidavit stated that defendant "changed his story a number of times and it was difficult to follow," "kept adding and changing facts," "kept changing pieces of the story," and noted that one statement during a final interview "was different than what he had just told us less than 10 minutes before and also different than when we first met him at the scene." In all, there were many inconsistencies in defendant's statements including (1) what he saw that day, (2) what he did after the deer was shot, (3) whom he saw in the woods, (4) when he had last shot his gun, (5) whether he knew about the salt licks, and—most importantly—(6) what happened to the antler point.

¶ 53. Additionally, there was a tremendous amount of evidence before the jury, beyond defendant's statements, from which the jury could have concluded that defendant was attempting to deflect an investigation. For instance, the State pointed to statements meant to conceal. See State v. Sargood, 77 Vt. 80, 85-86, 58 A. 971, 972 (1904) (in explaining importance of motive in determining guilt, stating "[t]hat the accused has committed another crime . . . does tend to prove that he committed the crime charged when it tends to prove that he was actuated by a motive, or entertained a plan or purpose, which would naturally prompt him to commit it."). These circumstances included: (1) defendant's normal hunting spot was just thirty yards from where the deer was shot; (2) he had a "clear line of sight"; (3) his rifle was the only one of the three observed by the warden to have been fired recently; (4) the witness saw no one else in the woods; (5) defendant was the only person to walk up to the deer after it fell; (6) he then said to the witness "I'm going to have a heck of a time making this into a three pointer"; and (7) defendant said he "laid [a one-inch knife blade] on the antler point, and the antler point fell off." These statements are circumstantial evidence, but circumstantial evidence is frequently the only proof of criminal intent. See State v. Cole, 150 Vt. 453, 456, 554 A2d. 253, 255 (1988) (in case concerning whether

23

defendant's grabbing of police officer's flashlight was threatening behavior, holding that "[i]ntent is rarely proved by direct evidence; it must be inferred from a person's acts and proved by circumstantial evidence . . . the act of grabbing the flashlight could be found to be threatening behavior, done to communicate the intent of harm" (citation omitted)). The weight accorded to circumstantial evidence in determining a defendant's guilt is no less than the weight accorded to direct evidence. See State v. McAllister, 2008 VT 3, ¶ 17, 183 Vt. 126, 945 A.2d 863 ("The law makes no distinction between the weight given to either direct or circumstantial evidence, nor is a greater degree of certainty required of circumstantial evidence than of direct evidence."). It is the role of the jury to weigh these circumstances and to "draw rational inferences to determine whether disputed ultimate facts occurred." State v. Durenleau, 163 Vt. 8, 12, 652 A.2d 981, 983 (1994).

¶ 54. In determining whether the jury properly weighed the circumstances, I disagree with the majority on another point. It is clear that when it comes to the antler, defendant made three mutually incompatible statements directly to the warden during the course of the warden's investigation sufficient to support this verdict. Defendant initially told one story and said he did not know what had happened to the antler. Then, he "maybe even blamed [the witness]." Finally, after further questioning, he told a third story that "he would admit to the antler point" but said that the antler point fell off after he simply laid his knife on it. The State labels this third story "impossible." And the majority gives credence to this view, too, calling it "unbelievable," ante, ¶ 32, and noting that "[t]he warden acknowledged that it was not possible for a deer antler to break off 'simply by laying a piece of metal against it.'" Ante, ¶ 5.

¶ 55. There is ample evidence from which the jury could have—and indeed did—determine that the inconsistencies necessarily meant that defendant knowingly gave false information to the warden. The stories are so different that they simply are mutually incompatible. At least two of them must be false, and defendant must have known that they were false when he said them. See Zhan Chen v. Attorney Gen. of U.S., 241 F. App'x 848, 856-57 (3d Cir. 2007)

(assessing inconsistent stories between petitioner's immigration documents and holding that "the record reveals [] internal inconsistencies in Chen's story . . . he either lied on his I-485 or on his withholding application about whether he has been arrested); see also Abovian v. I.N.S., 257 F.3d 971, 977 (9th Cir. 2001) ("[I]nadvertent contradictions as to details can give rise to the suspicion that the petitioner made up the whole story, and the minor inconsistencies reflect the difficulty in telling a good lie.").

¶ 56. In conclusion, while I agree with the majority that this case is about deflection, not knowledge, our agreement ends there. The majority's interpretation of the statute adds an element to § 1754(a) that narrows the statute's application for the flimsiest of reasons—it overemphasizes Attorney Woodruff's testimony, draws an inapt comparison to the Massachusetts statute in Morse, and it inappropriately forecloses the possibility of using the logical inconsistencies of a defendant's statements to show that the defendant was lying. Moreover, the majority does all of this even as it acknowledges that the Legislature added the provision at issue here—the language "to deflect an investigation from the person or another person"—in an attempt to close a loophole and criminalize a wider, not narrower, class of behavior.

¶ 57. I am authorized to state that Justice Eaton joins this dissent.

_____
Chief Justice

25