## State of Vermont v. Howard Godfrey

[996 A.2d 237]

No. 08-217

Present: Reiber, C.J., Dooley, Johnson and Burgess, JJ., and Corsones, Supr. J., Specially Assigned

Opinion Filed April 9, 2010

*William H. Sorrell*, Attorney General, and *David Tartter*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Allison N. Fulcher* of *Martin & Associates*, Barre, for Defendant-Appellant.

¶ 1. **Reiber, C.J.** Defendant Howard Godfrey appeals his conviction of aggravated murder following a jury trial. Defendant argues that the evidence presented at trial was insufficient to prove guilt beyond a reasonable doubt. Defendant also argues that the trial court erred and violated his constitutional right to present a complete defense when the court limited his cross-examination of one of the State's primary witnesses. We affirm.

¶ 2. The evidence presented at trial disclosed the following. On October 29, 1991, the police discovered the body of Patricia Scoville in a remote area at Moss Glenn Falls just outside of Stowe, Vermont. The body was face down and hidden under leaves and tree branches. One of the State's experts testified that the pattern of dried blood on Scoville's face indicated that she had been in a different position at the time she bled. The front of Scoville's clothing had dirt and debris on it in a series of lines, which, according to one of the State's experts, indicated that her body had been dragged. The edges of Scoville's shirt, pants, and

underpants were partially rolled down and contained dirt and leaves. Debris and leaves also covered parts of the front of Scoville's body. The State additionally presented evidence that Scoville's pants were not on straight and that "her panties were very stretched out . . . like someone had pulled on them."

¶ 3. Scoville was twenty-eight years old at the time of her death. She had moved to Stowe from Boston, Massachusetts, in September 1991. Later that same month, Scoville and her friend, Neil Hillmer, bicycled to Moss Glenn Falls. On October 1, Scoville moved into an apartment in Stowe with a roommate. On the morning of October 21, after being away since the previous evening, Scoville returned home to her apartment and stayed there during the morning, baking and eating cookies. Around noon, Scoville decided to go bicycling. She did not tell her roommate where she was going. Her roommate did not see her again.

¶ 4. The last known sighting of Scoville, after she left her apartment, occurred when she visited a local bank and cashed a check at 1:39 p.m. The bank teller saw Scoville depart from the bank on her bicycle around 1:45 p.m., heading toward town. No one reported seeing her alive after this time.

¶ 5. On October 22, Scoville's roommate became concerned that Scoville had not yet returned home from her bicycle trip. On October 23, the roommate called the local hospital and then the police to report that Scoville was missing. The police immediately launched an investigation and provided the local television stations with a description of Scoville and her bicycle. The stations broadcasted this information on the evening news, and a local resident contacted the police that night to report a sighting earlier that day of a bicycle leaning against a tree in the Moss Glenn Falls area. Three police officers traveled to Moss Glenn Falls that evening and discovered the bicycle. They also found a pair of gloves nearby, at an area overlooking the falls. On October 24, the police launched a full search of the Moss Glenn Falls area, and the search continued until October 29, when Scoville's body was finally discovered.

¶ 6. On October 30, the State's medical examiner performed an autopsy on Scoville. At trial, he testified that he found lacerations and bruises indicating blunt-force injuries on Scoville's head and face, as well as neck injuries that were characteristic of strangulation and asphyxiation. He concluded that oxygen deprivation —

"due to manual and/or ligature strangulation" — was the cause of death.

¶ 7. The medical examiner additionally provided testimony that Scoville's vaginal area had been subject to trauma or injury of some sort, including some tearing of the hymenal ring. In his view, the nature of the injuries indicated an early reaction that suggested that the injuries occurred when Scoville was still alive. The medical examiner testified that it was his opinion that the injuries to Scoville's head, face, and neck, and the injuries to her vaginal area, "all occurred at or about the same time and at or about the time of death."

¶ 8. The autopsy of Scoville also involved an examination of her stomach contents, which revealed the presence of theobromine — a chemical that is typically found in chocolate. The medical examiner testified that theobromine is normally completely emptied from the stomach within four hours after consumption and that digestion ceases upon death. Thus, if chocolate had been consumed around noon on October 21 — when Scoville had been seen eating cookies — it would have been undetectable unless Scoville died before 4:00 p.m. that same afternoon. The medical examiner noted that the state of Scoville's body — both when she was found and at the autopsy — was "entirely consistent" with her having died within several hours of her visit to the bank at 1:39 p.m. on October 21.

¶ 9. The medical examiner took vaginal, anal, and oral swabs during the autopsy. The vaginal swab revealed "the presence of a large amount or abundant spermatozoa or sperm cells." The medical examiner then testified as follows regarding the significance of this finding:

> The presence of abundant spermatozoa, that means that they're very easy to find, and they were very frequently found, indicates a relatively high concentration or relatively large amount of semen that had been deposited. Now with normal activities, semen would tend to dissipate or drain away, so the presence of a large amount would suggest a recent deposition of the semen.

¶ 10. The State investigated and prosecuted this case under the theory that it was a combined rape and murder. Based upon the large amount of semen found in Scoville's vagina, as well as other factors, such as the injuries to her vagina, her pants being

off-center, and her underwear being stretched out and having leaves in it, one of the State's witnesses, Detective Merriam, testified that Scoville was raped, that it "happened there" in the woods, and that she was killed at or around the same time. He testified that a combined rape and murder explained why there was evidence that "someone else pulled up the pants" and underwear afterwards.

¶ 11. Defendant became a person of interest in the investigation in 2005, when the FBI alerted the Stowe Police Department that defendant's DNA matched the DNA found in the semen from Scoville's underwear.[1] The police interviewed defendant, and he at first denied having known Scoville, having dated her, or having had intercourse with her. Defendant was placed under surveillance, and an investigator collected defendant's discarded cigarette butts for further DNA sampling. One of the State's experts testified that the match between defendant's DNA and the semen found in Scoville's underwear was conclusive; the chance of the match happening by coincidence was "one in 230 quadrillion."

¶ 12. On March 30, 2005, defendant was arrested and brought to the St. Johnsbury State Police barracks. After being given his *Miranda* rights, defendant admitted to having had sex with Scoville. Defendant expressed concern that, because he had admitted to having sex with Scoville, the police would "automatically . . . charge [him] with murder because [he] knew that was the outcome of that situation." Defendant then invoked his right to have a lawyer present before the police could engage in any further questioning.

I.

¶ 13. We first address defendant's argument that the evidence presented at trial was insufficient to prove guilt beyond a reasonable doubt. Defendant faces a heavy burden in arguing on appeal that we should overturn the jury's unanimous verdict: in reviewing a challenge to the sufficiency of the evidence, "this Court will review the evidence presented by the State viewing it in the light most favorable to the prosecution and excluding any

---

[1] Defendant had provided a DNA sample following a 1996 conviction for aggravated assault. See generally 20 V.S.A. §§ 1931-1946 (explaining creation and use of state DNA database). The jury was not informed of the aggravated assault conviction or of the DNA databank match.

modifying evidence, and determine whether that evidence sufficiently and fairly supports a finding of guilt beyond a reasonable doubt." *State v. Brochu*, 2008 VT 21, ¶ 21, 183 Vt. 269, 949 A.2d 1035 (quotation omitted). Thus, although defendant presents alternative explanations for much of the evidence presented against him at trial, the only question for us on appeal is whether the State's theory of the evidence supports a finding of guilt beyond a reasonable doubt. See *id.*; see also *State v. Couture*, 169 Vt. 222, 226, 734 A.2d 524, 527 (1999) ("[A] judgment of acquittal is proper only if the prosecution has failed to put forth any evidence to substantiate a jury verdict.").

██ ██ ¶ 14. Defendant was convicted of aggravated murder. To obtain a guilty verdict for aggravated murder, the State's burden at trial was to prove beyond a reasonable doubt that defendant "commit[ted] a first or second degree murder" when an aggravating factor was present. 13 V.S.A. § 2311(a). Here, the alleged aggravating factor was that "[t]he murder was committed in perpetrating or attempting to perpetrate sexual assault or aggravated sexual assault." *Id.* § 2311(a)(8). In short, to obtain a conviction for aggravated murder in this case, the State had to prove beyond a reasonable doubt that defendant committed a combined rape and murder of Scoville. To prove that a sexual assault occurred, the State had to demonstrate beyond a reasonable doubt that defendant "engage[d] in a sexual act with another person and compel[led] the other person to participate in a sexual act without the consent of the other person." *Id.* § 3252(a)(1). At issue here was whether Scoville consented to the sexual act that led to defendant's semen being deposited in her.

¶ 15. As recounted above, the State presented unambiguous DNA evidence and a confession from defendant that established that he penetrated Scoville and deposited semen in her sometime near the time of her death. The defense's theory is that the State failed to prove that defendant's sexual encounter with Scoville was anything other than consensual intercourse that occurred hours or days before — and separate from — the murder.

¶ 16. The State did, however, present evidence that defendant's penetration of Scoville was nonconsensual. For instance, the State's medical examiner described injuries to Scoville's vagina and referred to Scoville's underwear as having been stretched out. Further, the injuries to Scoville's head and neck support the

theory of a violent sexual assault. The State also presented evidence that the penetration of Scoville occurred at or immediately before the time of death: the large quantity of semen found in Scoville, as well as her pants and underwear appearing to have been pulled on by someone other than herself, allowed a reasonable inference that Scoville never stood up after penetration and that the same person raped and murdered her. This evidence additionally provided a motive: if defendant sexually assaulted Scoville, then he would have had a motive to murder her to cover up the sexual assault by silencing the only witness to it. The State argued, and the jury could have reasonably believed, that there was no other motive for the murder, since Scoville's body had money and jewelry on it, thereby ruling out any claim that this was a robbery.

¶ 17. The State's theory that this was a combined rape and murder finds additional support in evidence that, when defendant was first interviewed by the police, he denied having dated or had intercourse with Scoville and claimed that he did not even know her. Defendant's untruthful statement here, combined with evidence that defendant's penetration of Scoville was nonconsensual, could have led a reasonable jury to find that defendant had lied when he claimed that consensual intercourse led to the presence of his semen in Scoville's vagina and underwear. Cf. *Brochu*, 2008 VT 21, ¶ 29 ("When considered in the light most favorable to the State, this pattern of lies could reasonably have led the jury to believe defendant had tried to cover up his actions, which the jury could accept as an indication of guilt."). The lack of any evidence that defendant had an underlying relationship with Scoville provided further support for the State's theory that defendant's penetration of Scoville was sexual assault. See *id.* ¶ 38 ("[B]eing murdered is a fate more frequent among rape victims than friendly sex partners." (quotation omitted)).

¶ 18. Defendant is correct that the evidence against him was circumstantial, but this does not mean that the evidence was insufficient. As we have noted, many crimes occur without eyewitnesses or other direct evidence, and the State is allowed to rely exclusively on circumstantial evidence in proving its case:

> Our case law is clear that the guilt of a defendant in a criminal case may be proved by circumstantial evidence alone, if the evidence is proper and sufficient in itself.

> The sufficiency of circumstantial evidence to support a conviction is measured against the same standard as all other evidence: it will sustain a conviction if sufficient to convince a reasonable trier of fact that the defendant is guilty beyond a reasonable doubt. In addition, the State is not required to exclude every reasonable hypothesis of innocence in proving a case with circumstantial evidence.

*State v. Warner*, 151 Vt. 469, 472, 560 A.2d 385, 387 (1989) (citations omitted). So long as the jury "by way of a process of rational inference" could conclude beyond a reasonable doubt that defendant committed the acts for which he was charged, we will not disturb the jury's verdict. *Id.* at 472, 560 A.2d at 388.

¶ 19. Defendant's main argument here is that convictions cannot rest upon inferences drawn from other inferences. The State, by contrast, argues that no such bright-line rule exists. Defendant cites cases such as *Commonwealth v. Reaves*, 750 N.E.2d 464 (Mass. 2001), which held that "a conviction may not rest upon the piling of inference upon inference." *Id.* at 470 (quotation omitted). In *Gero v. John Hancock Mutual Life Insurance Co.*, 111 Vt. 462, 479-81, 18 A.2d 154, 163-64 (1941), this Court addressed the issue of relying on inferences upon inferences. We held that "[t]he only inferences of fact which the law recognizes are immediate inferences from the facts proved." *Id.* at 480, 18 A.2d at 163. While this language supports defendant's argument, other parts of *Gero* support the State's position. In particular, the *Gero* Court recognized that the rule against relying on inferences upon inferences was not violated by what can be referred to as parallel inferences: "a given state of facts proven to the satisfaction of the jury may give rise to two or even more separate inferences, and in such a case one inference is not built upon the other, each is drawn independently from the same evidence." *Id.*

¶ 20. Upon further reflection, we now conclude that the distinction recognized in *Gero* between impermissible "inferences upon inferences" and permissible "parallel inferences" is unworkable, and we therefore abandon it. This case is a perfect example of why such a distinction is unworkable, since here defendant argues that the State asked the jury to draw inferences upon inferences, while the State insists that it asked the jury to draw only parallel inferences. This type of (often epistemological) debate is ultimately nothing more than a distraction from the real

question that must be addressed: whether the "evidence sufficiently and fairly supports a finding of guilt beyond a reasonable doubt." *Brochu*, 2008 VT 21, ¶ 21.

¶ 21. In the many decades since *Gero*, courts have moved away from a hard and fast rule forbidding evidence based on inferences upon inferences. See, e.g., *Motorists Mut. Ins. Co. v. Hamilton Twp. Trs.*, 502 N.E.2d 204, 207 (Ohio 1986) ("[T]he rule forbidding the stacking of an inference upon an inference is disfavored by scholars and many courts. . . . The rule is now rejected in most federal circuit courts."); see generally W. Shipley, Annotation, *Modern Status of the Rules Against Basing an Inference upon an Inference or a Presumption upon a Presumption*, 5 A.L.R.3d 100, 105, § 2 (1966) (surveying case law on this issue and noting that rule has received "almost unanimous criticisms of legal scholars and of those courts which have gone into the matter at any length"). *Gero* itself recognized that "the rule forbidding an 'inference upon an inference' is unorthodox and fallacious," and we noted that this rule was "originally put forward without authority" and that the rule "has been frequently repudiated by various courts." 111 Vt. at 479, 18 A.2d at 163. Further, a rule forbidding all inferences upon inferences contradicts at least three of our other precedents. First, the application of this type of bright-line rule contradicts our statement in numerous cases that "we have expressly declined to fashion a hard and fast rule regarding the sufficiency of evidence in a circumstantial case." *State v. Baird*, 2006 VT 86, ¶ 13, 180 Vt. 243, 908 A.2d 475 (quotation omitted). Second, such a rule contradicts our holding that circumstantial evidence must be treated the same as direct evidence. *State v. Olds*, 141 Vt. 21, 26, 443 A.2d 443, 445 (1981) ("[T]he usual instruction may have given the impression that there is a special rule relating to the sufficiency of evidence in circumstantial evidence cases. This is not so . . . ."). Third, by focusing on each individual piece of evidence to determine how many inferences it involves, the rule contradicts our holding that "the evidence presented must be considered together, not separately." *State v. Grega*, 168 Vt. 363, 380, 721 A.2d 445, 457 (1998).

¶ 22. The only special test for inferences is that they must be reasonable. See *Olds*, 141 Vt. at 26, 443 A.2d at 445 (holding that facts may be proved by "reasonable inferences"). While we recognize that inferences are more likely to be unreasonable when

they are based upon other inferences — which in some instances could lead to such evidence being excluded under Vermont Rule of Evidence 403 or another evidentiary rule — this does not warrant the outright ban that defendant requests here.

¶ 23. For the reasons discussed above, we find that any inferences made by the jury in this case were reasonable and sufficiently based upon the evidence provided at trial. The State presented DNA evidence that the semen found in Scoville's vagina belonged to defendant, and defendant confessed to having penetrated Scoville. Thus, to find defendant guilty beyond a reasonable doubt, the only significant inference that the jury needed to make in this case was that it was beyond a reasonable doubt that whoever penetrated Scoville and left semen in her was also the person who murdered her. Taking the evidence in the light most favorable to the State, we find that the State presented ample evidence to support that inference here. For instance, the State's medical examiner testified that the large amount of semen present in Scoville's vagina, as well as the presence and timing of injuries to her vagina, suggested that defendant's semen was deposited in Scoville at around the same time as the murder. Another witness for the State similarly testified that, given the injuries to Scoville's vagina, her pants being off-center, and her underwear being stretched out and having leaves in it, it was his conclusion that Scoville was raped and that it happened in the woods at or around the same time as the murder. To the extent that defendant questions the credibility of the testimony given by the State's witnesses, that is a matter that falls "entirely within the province of the jury." *State v. Hinchliffe*, 2009 VT 111, ¶ 22, 186 Vt. 487, 987 A.2d 988. As we recently stated, this Court "will not second-guess the jury's determination of credibility, and, in the context of a motion for acquittal, we view the evidence in the light most favorable to the State." *Id.* For these reasons, we conclude that the evidence was sufficient to find defendant guilty beyond a reasonable doubt.

## II.

¶ 24. Defendant also argues that the trial court erred and violated his constitutional right to present a complete defense when it limited his cross-examination of one of the State's primary witnesses. According to defendant, he should have been allowed

greater leeway in cross-examining Detective Bruce Merriam on the investigative process and how Detective Merriam determined who was responsible for murdering Scoville. We disagree.

¶ 25. At various points in the proceedings below, defendant sought to highlight the fact that, before the investigation focused on defendant, Detective Merriam suspected many other people of murdering Scoville. In particular, defendant wanted the jury to know that, during the course of the investigation, Detective Merriam signed at least twelve affidavits to obtain DNA or other physical samples from twelve different individuals, and, in each of those affidavits, he stated that he had probable cause that someone other than defendant was Scoville's murderer. The implication was that if Detective Merriam was wrong on twelve previous occasions, then he was more likely to be wrong now in his claim that defendant murdered Scoville.

¶ 26. The trial court held in a pretrial ruling that defendant could not introduce evidence regarding the twelve individuals whom Detective Merriam had previously suspected. The trial court found that the proffered evidence regarding those twelve individuals was inadmissible for various reasons, including a failure to meet this Court's test, set forth in *Grega*, regarding the introduction of evidence implicating third parties. See 168 Vt. at 375, 721 A.2d at 454.

¶ 27. On appeal, defendant has abandoned a number of the arguments that he raised at the trial court level, and we therefore need not address those arguments. See, e.g., *McAdams v. Town of Barnard*, 2007 VT 61, ¶ 8, 182 Vt. 259, 936 A.2d 1310 ("Arguments not briefed are waived."). In particular, defendant's current argument is limited to whether the jury should have been allowed to hear information regarding three individuals — Neal Besser, Ronald Gabaree, and Philip Kelly — and how those suspects were handled in the investigative process. That argument fails for at least two reasons.

¶ 28. First, defendant's cross-examination of Detective Merriam was not nearly as limited as defendant claims. Defendant was not improperly prevented from trying to impeach Detective Merriam. The trial court stated in a bench conference that it would revisit its evidentiary rulings if "Detective Merriam made some determination that would be inconsistent with" information that defendant had about specific individuals and how the inves-

tigation proceeded. The court therefore properly recognized that defendant could use otherwise inadmissible information to impeach Detective Merriam, but only to the extent that Detective Merriam opened the door.

¶ 29. Similarly, despite defendant's claims to the contrary, a review of the record reveals that he was permitted to elicit testimony from Detective Merriam that highlighted what defendant viewed as deficiencies in the investigation. Although the trial court prevented defendant from using the names of third-party former suspects, the court made it clear that there would inevitably be "questioning about [what] the police actually did in terms of the actual investigation that they conducted." Defendant was thus able to ask many of the questions that he sought to direct at Detective Merriam. In particular, defendant was able to elicit testimony that called into question the validity of the investigation. The trial court specifically stated that "Detective Merriam can be questioned along the lines that there were other suspects that . . . based on his operating premise or hypothesis . . . were excluded for that reason alone, because of the results of the DNA test." Detective Merriam gave testimony admitting that the investigation proceeded on the assumption that any DNA evidence recovered from Scoville's body was the DNA of the murderer, and he agreed that he would have made "a terrible mistake" if he was wrong in that assumption. He agreed that DNA samples were taken from over eighty men and that "no matter what other evidence [he] had about one of these men . . . , if their DNA did not match they were not the murderer."

¶ 30. Detective Merriam also admitted that one suspect was eliminated solely because his hair did not match the two head hairs that were found in Scoville's mouth. This testimony was particularly important for the defense because defendant presented an expert witness who testified that, at the request of the prosecution, she had analyzed the DNA of the head hairs and concluded that defendant's DNA excluded him from being a possible source of these hairs. Defendant was therefore not prevented from introducing his theory that the investigation was flawed and biased, since it excluded some suspects for having DNA that did not match the head hairs found in Scoville's mouth, but did not exclude defendant as a suspect when his DNA did not

match the hairs.[2] For these reasons, we disagree with defendant's claim that the jury was left with an unfair representation of the investigation that took place.

■■ ¶ 31. The second reason why defendant's argument fails is that, to the extent that the trial court did place limitations on defendant's cross-examination of Detective Merriam, we find no error in those limitations. Defendant argues that the trial court's limitations on his cross-examination of Detective Merriam violated defendant's rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution.[3] We recently noted that the Confrontation Clause is linked to the admissibility of the underlying evidence that defendant seeks to introduce:

> [W]e agree that the Sixth Amendment to the United States Constitution guarantees the right of a criminal defendant to be confronted with the witnesses against him and that the Confrontation Clause has been incorporated to apply to state proceedings via the Fourteenth Amendment. The Clause includes not only the right to cross-examine adverse witnesses, but also entitles a criminal defendant wide latitude on cross-examination for the purpose of showing who and what the witness is, and that he is unreliable, prejudiced, or biased. Yet the

---

[2] Whether the State's investigation was ultimately flawed or biased presented a question of credibility that was properly left for the jury to decide. Cf. *Hinchliffe*, 2009 VT 111, ¶ 22. One of defendant's other expert witnesses admitted that the head hairs could have been from Scoville's roommate. The jury apparently found this or another innocent explanation for the head hairs more plausible than defendant's theory that the hairs belonged to the murderer, and the jury clearly placed more weight on the unequivocal match between defendant's DNA and the semen found on Scoville's body.

[3] Defendant also cites Chapter I, Article 10 of the Vermont Constitution as a basis for overturning the trial court's decision. However, as we recently noted, "[b]ecause defendant does not distinguish how our analysis under Article 10 of the Vermont Constitution should differ from an analysis under the U.S. Constitution's Confrontation Clause, we decline to interpret the State Constitution in this case." *State v. Forty*, 2009 VT 118, ¶ 23 n.2, 187 Vt. 79, 989 A.2d 509 (citing *State v. Raymond*, 148 Vt. 617, 619 n.1, 538 A.2d 164, 165 n.1 (1987)). Although courts have linked the more general right "to present a complete defense" to other provisions of the United States Constitution, see, e.g., *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (citing as possible sources for this right the Due Process Clause of the Fourteenth Amendment and the Compulsory Process Clause of the Sixth Amendment, in addition to the Confrontation Clause), defendant does not allege on appeal violations of these other constitutional provisions.

Clause's protections are not boundless. It gives the defendant an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. In particular, the Clause applies only to evidence that is relevant and otherwise admissible under the rules of evidence.

*Forty*, 2009 VT 118, ¶ 24 (quotations and citations omitted).

¶ 32. As we noted in *Forty*, the Confrontation Clause does not allow a defendant to use cross-examination to introduce inadmissible evidence. *Id.* ("In general, exclusion of evidence that is not admissible does not violate the Sixth Amendment."); see also, e.g., *People v. Prince*, 156 P.3d 1015, 1052 (Cal. 2007) ("[A]pplication of the ordinary rules of evidence generally does not impermissibly infringe upon a . . . defendant's constitutional rights." (quotation omitted)). We review the trial court's decision on the exclusion of evidence only for abuse of discretion. See *Grega*, 168 Vt. at 378, 721 A.2d at 456 (holding that trial court did not abuse its discretion in excluding evidence); see also, e.g., *USGen New Eng., Inc. v. Town of Rockingham*, 2004 VT 90, ¶ 22, 177 Vt. 193, 862 A.2d 269 ("We . . . use abuse of discretion review for evidentiary rulings generally."). We conclude here that defendant was attempting to use cross-examination to introduce inadmissible evidence regarding other individuals whom the police at one point suspected of murdering Scoville, and we hold that the trial court did not abuse its discretion in preventing defendant from introducing such evidence.

¶ 33. We stated in *Grega* that "evidence tending to show a third party's involvement in a crime should be admitted as long as motive and opportunity have been shown and there is also some evidence to directly connect the third person to the crime charged." 168 Vt. at 375, 721 A.2d at 454 (quotations omitted).[4] As we recently noted, "evidence of a possible alternative perpetrator has a special admissibility hurdle." *State v. Schreiner*, 2007 VT 138, ¶ 27, 183 Vt. 42, 944 A.2d 250. Defendant appears to argue that notions of parity should lead courts to abandon *Grega's* direct connection requirement, since the State does not need to meet

---

[4] Some courts have referred to this type of evidence as invoking the "Perry Mason defense." *United States v. DeNoyer*, 811 F.2d 436, 440 (8th Cir. 1987).

that requirement when using circumstantial evidence against defendant. See, e.g., L. Griffin, *Avoiding Wrongful Convictions: Re-examining the "Wrong-Person" Defense*, 39 Seton Hall L. Rev. 129, 132-33 (2009) ("[A]lthough a prosecution witness is almost always permitted to point the finger at the defendant with only the barest of reliability protections and no corroboration at all, defense witnesses are routinely prohibited from pointing the finger at someone else. An evolved notion of parity — which lies at the core of due process — requires a fairer judicial inquiry into the admissibility of wrong-person-defense evidence."). In *People v. Hall*, 718 P.2d 99, 104 (Cal. 1986), for instance, the court stated that "courts should simply treat third-party culpability evidence like any other evidence." But even the *Hall* court noted that, in doing a Rule 403 analysis, "there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." *Id.* Most courts have come to a similar conclusion and have required defendants to show something, such as a direct connection, before introducing this type of evidence, to ensure that the evidence is relevant and that the jury will not be confused by trials within trials of third-party suspects whose innocence or guilt is not before the jury. See J.B.G., Annotation, *Admissibility in Criminal Prosecution of Evidence of Motive of One Other than Defendant to Commit the Crime*, 121 A.L.R. 1362, Cum. Supp. (1939 & 2009) (listing cases upholding these types of rules in numerous jurisdictions). As the United States Supreme Court recently recognized, rules such as these limiting the admission of third-party guilt evidence "are widely accepted." *Holmes*, 547 U.S. at 327; accord *id.* at 327 n* (citing dozens of cases, including *Grega*, upholding these types of rules).

¶ 34. Although the *Holmes* Court held that courts must be careful in applying such rules and cannot exclude third-party culpability evidence based upon the strength of the evidence of defendant's guilt, *id.* at 329-31, the *Holmes* Court also expressed approval of rules that "focus the trial on the central issues by excluding evidence that has only a very weak logical connection to the central issues," *id.* at 330. We hold that the *Grega* test properly serves this function. The *Grega* test is based on Vermont Rule of Evidence 403, which allows the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." V.R.E. 403; see *Grega*, 168 Vt. at 375, 721 A.2d at 454

("Such evidence . . . must conform to the rules of evidence, and may be excluded when the danger of unfair prejudice or confusion substantially outweighs its probative value.").

¶ 35. As mentioned earlier, at trial defendant sought to ask Detective Merriam questions about the potential guilt of Neal Besser, Ronald Gabaree, and Philip Kelly. Many years before defendant became the prime suspect in the investigation, Detective Merriam at one point signed an affidavit saying that he had probable cause that each of these individuals murdered Scoville.

¶ 36. To the extent that Neal Besser was connected to the general crime scene and Ronald Gabaree purportedly confessed to the crime charged, the trial court did not abuse its discretion in holding that those proffers were too attenuated and insufficiently direct to satisfy the *Grega* test. In an October 22, 1992 affidavit, Detective Merriam stated that in August 1992 Neal Besser encountered a group of hikers in the Moss Glenn Falls area. During the encounter, Neal Besser acted territorially, leered at a woman, commented on the woman's body, threatened to "beat the fucking shit out of [her] and all of [her] fucking boyfriends," and said something to the effect of "if you think that's all I'm capable of, you haven't seen anything." When initially questioned about the encounter, Neal Besser allegedly lied by denying knowledge of the location of Moss Glenn Falls. The affidavit also stated that Neal Besser had a history of incidents of unwelcome and aggressive behavior toward women, including death threats. In an October 24, 2001 affidavit, Detective Merriam stated that Ronald Gabaree lived and worked in Stowe at the time of the murder and that he had a history of sexual assault. The affidavit also recounted a conversation with an inmate, Clifford Bartz, who claimed that Ronald Gabaree confessed to the crime in the spring of 1992.

¶ 37. As in *Grega*, although these statements "paint[] a picture of a compelling defense pointing to [third parties] as the actual perpetrators," defendant has "established no direct link between [these third parties] and the crime of which he was accused." 168 Vt. at 378, 721 A.2d at 456. Rather, defendant has "merely gathered together a number of remote acts, unsubstantiated statements, and unconnected activities or proclivities" to try to implicate others. *Id.* (quotation marks omitted). Also like *Grega*, much of the evidence that defendant wished to introduce against these third parties is inadmissible hearsay not falling under any

exception, see *Grega*, 168 Vt. at 376, 721 A.2d at 454; see generally V.R.E. 804, or inadmissible "propensity evidence" offered to show that the third parties' previous bad acts made them likely to have committed *these* bad acts, see *Grega*, 168 Vt. at 376, 721 A.2d at 455; see generally V.R.E. 404(a). For these reasons, at least with respect to Neal Besser and Ronald Gabaree, the trial court did not abuse its discretion in finding that there was no direct connection between these third parties and the crime charged. See *Grega*, 168 Vt. at 378, 721 A.2d at 456.

¶ 38. Although Philip Kelly has a greater connection to the crime charged, his alleged statements suffer from other evidentiary problems. In a December 27, 1991 affidavit, Detective Merriam attached a supplemental affidavit from Detective Myles Heffernan, who interviewed several people and concluded that Philip Kelly had a history of aggressive behavior toward women, had attended numerous Adult Children of Alcoholics meetings with Scoville, and had told another that he had a date with someone matching Scoville's description on the date she disappeared. The timing of the alleged date with Scoville arguably established a direct connection between Philip Kelly and the crime charged. Nevertheless, here it is important to recount exactly how defendant intended to introduce evidence connecting Philip Kelly to this crime: defendant sought to cross-examine Detective Merriam on information that Detective Merriam learned from Detective Heffernan, who interviewed Perry Lowell about what Philip Kelly told Lowell. In this context, Detective Merriam is several steps removed from whatever conversation allegedly took place between Lowell and Philip Kelly. While our rules allow hearsay within hearsay (and therefore presumably allow triple hearsay as well) "if each part of the combined statements conforms with an exception to the hearsay rule," V.R.E. 805, defendant does not argue that each level of hearsay falls under an exception here. See, e.g., *McAdams*, 2007 VT 61, ¶ 8 ("Arguments not briefed are waived."). Further, given how attenuated this evidence was, if any probative value could have been gleaned from such evidence, it was substantially outweighed by the significant potential for confusing the jury, and the trial court therefore properly excluded it. See V.R.E. 403. For these reasons, we conclude that the trial court did not err in limiting defendant's cross-examination of Detective Merriam.

*Affirmed.*