NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2020 VT 36

No. 2018-226

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Addison Unit, |
| | Criminal Division |
| | |
| Matthew J. Redmond | October Term, 2019 |

Helen M. Toor, J.

David Tartter and James Pepper, Deputy State's Attorneys, Montpelier, for Plaintiff-Appellee.

Matthew Valerio, Defender General, and Rebecca Turner, Appellate Defender, Montpelier, for Defendant-Appellant.

PRESENT: Reiber, C.J., Robinson and Eaton, JJ., and Dooley, J. (Ret.) and Pearson, Supr. J. (Ret.), Specially Assigned

¶ 1. **EATON, J.** Defendant appeals his convictions for reckless endangerment, unlawful mischief, and providing false information to a law enforcement officer. He argues that: (1) the court should have sua sponte granted him a judgment of acquittal on the first two counts because the State was required, and failed, to establish that he threw a "prybar" at the windshield of a passing vehicle; (2) he was entitled to a sua sponte judgment of acquittal on the third count because the State failed to narrow the allegedly false information at issue or prove that every statement he made satisfied the elements of this crime; and (3) the court failed to properly instruct the jury regarding reasonable doubt, the presumption of innocence, and the requirement of unanimity. Defendant raises all of these arguments for the first time on appeal. We reverse and

remand defendant's false-information conviction for a new trial; we affirm his remaining convictions.

## I. Trial Proceedings

¶ 2.    Defendant was charged with numerous crimes after allegedly throwing an object at the windshield of a passing pickup truck and lying to police about what occurred. The driver of the truck was sixteen years old. The following evidence was presented at a one-day trial. The driver testified that around 9:00 p.m. on a snowy February evening, he dropped several friends off at a home on Jockey Road in Ferrisburgh, Vermont. He drove cautiously because the road was covered with an inch or more of snow. The friend's house was located at the dead-end of Jockey Road. The driver dropped off his friends, turned around, and headed home.

¶ 3.    Shortly thereafter, the driver saw a man standing in the middle of Jockey Road. The man held a large object, which in the moment the driver thought was a splitting maul or sledgehammer. The driver had only seconds to look at the object, it was dark, and he was scared. He moved to the far right to avoid striking the man and went off the traveled portion of the road. The man threw the object at his windshield, shattering the glass on the driver's side. Glass flew into the driver's eyes and he lost control of his truck. He feared for his life. He maneuvered his truck out of the ditch and drove back to his friend's house. On his way, he saw the man hide behind a tree. The driver rushed inside his friend's house and recounted what occurred. The friend's parents helped the driver with his eyes and called police. The driver's friend testified to a similar version of events.

¶ 4.    Photographs of the damaged truck were admitted into evidence, including close-up photographs of the shattered windshield. The driver testified that the photographs showed orange flakes in the broken windshield that were not present before the incident.

¶ 5.    One of the investigating officers also testified. He stated that two calls came in from Jockey Lane that evening. The first reported someone throwing a sledgehammer or

something similar through a vehicle's windshield. The second call, made by defendant twenty-four minutes later, reported erratic operation. As they drove up Jockey Road, police did not see any signs of erratic operation, such as yaw marks. They did see tire marks where it appeared that a vehicle had gone off and then back onto the roadway. The tracks appeared to reflect an abrupt turn off and then back onto the roadway rather than a vehicle that had slowly drifted off the road. The marks were just to the left of a driveway, where the officers observed someone standing in dark clothing. The trooper also saw a divot in the center of the roadway, just after the truck's tire marks. It looked like something hit the roadway after bouncing off the truck's windshield. Video from the trooper's cruiser was played for the jury.

¶ 6. The trooper spoke to the driver, who was very shaken up. The driver recounted what occurred, as set forth above. The trooper examined the truck and saw that something appeared to have punctured the truck's windshield. The glass on the driver's side was completely smashed, with a hole right where the driver's head would have been.

¶ 7. After speaking with the driver, police spoke with defendant, who was at a nearby property where siblings Matthew and Marion Swan resided. Defendant knew the Swans well; he worked for them and once had a relationship with Ms. Swan. Defendant said he was at the Swan property for work-related reasons. According to defendant, a vehicle was operating erratically on Jockey Road all night long. He walked toward the road for a closer look and saw an older pickup truck like that driven by the complainant. The truck swerved, drove directly at him, and tried to hit him; he hid behind a tree. The truck then began to fishtail and went into a ditch on the opposite side of the road. The truck turned around, came back directly at defendant, and tried to hit him again. Defendant hid behind a different tree. Defendant pointed to tire tracks in the snow, which he claimed belonged to the truck. The officer pointed out that the tire tracks were from his police vehicle and noted that they led right to his SUV.

3

¶ 8.     As indicated above, the trooper saw nothing in the roadway consistent with defendant's version of events.  He testified that for defendant's story about the complainant trying to hit him to be true, defendant would have had to have been standing in the middle of the roadway because the truck's tire marks never left the westbound portion of the roadway.  The trooper also observed footprints behind one of the trees near the driveway, but not behind the second tree.

¶ 9.     The trooper asked defendant if he had thrown anything at the vehicle.  Because the initial police report mentioned a sledgehammer, he asked defendant what happened with the sledgehammer.  Defendant initially did not say anything.  He looked at a garage on the property and at Mr. Swan, who was standing next to him.  Defendant denied owning a sledgehammer and said he did not know what the officer was talking about.

¶ 10.     Police found several sledgehammers in the garage, but none appeared wet or snowy.  They observed a prybar with a broken orange handle lying alone on the middle of the garage floor.  The troopers found this odd, as the other tools were on workbenches or up against the wall.  They did not collect the prybar that evening.  A trooper seized it two weeks later when he went to the Swan property in response to a call from Ms. Swan.  The trooper testified that after he saw photographs of the orange plastic pieces embedded in the broken windshield, it clicked for him that the pieces were possibly from the prybar's broken orange handle.  He identified the orange pieces in the photographs.  He testified that the pieces appeared to be from the prybar's handle and that the prybar could have caused the damage to the windshield.

¶ 11.     Defendant testified on his own behalf, largely reiterating what he said to police, with some additions.  Defendant stated for the first time at trial that after seeing the truck fishtailing down the road, he heard glass breaking and a truck going off the road about two-hundred yards away, toward the main road.  He said that the truck then turned around and went toward the dead-end.  Defendant denied being in the middle of the road or throwing anything at the truck.

4

¶ 12.   The Swans also testified on defendant's behalf. Mr. Swan was not present during the alleged incident. He testified, contrary to his sworn statement to police, that he saw a truck operating erratically on Jockey Road all evening. He said that the prybar was his and that he had broken its handle several years earlier by hitting it with a hammer. He believed that the prybar was in the middle of the floor because he used it the day before the incident.

¶ 13.   Ms. Swan stated that on the evening in question, she went downstairs after hearing a loud noise. She saw a truck heading down the road. She described defendant as frantic, saying that someone had gone into a ditch. Defendant told her that a truck had swerved and hit a tree. On cross-examination, Ms. Swan acknowledged that, since this incident, she had reunited with her husband, Joseph Ploof. Mr. Ploof owned a truck like the driver's truck. According to Ms. Swan, defendant was convinced that Mr. Ploof was driving on Jockey Road that evening and that Mr. Ploof tried to hit him.

¶ 14.   On rebuttal, the driver testified that he was not on Jockey Road until 9:00 p.m. that evening. The trooper testified to his conversation with Ms. Swan, reiterating her statements that defendant identified Mr. Ploof's truck as the one that tried to hit him and defendant believed that he damaged Mr. Ploof's truck. The trooper also testified that Ms. Swan provided new details at trial that she did not express on the day of the incident. He stated that both Swans had a reputation in the community for being untruthful.

¶ 15.   The jury convicted defendant of reckless endangerment, unlawful mischief, and providing false information to a law enforcement officer. It acquitted him of aggravated assault with a deadly weapon, aggravated assault, and obstructing traffic. This appeal followed.

II.  Arguments on Appeal

A.  Reckless Endangerment and Unlawful Mischief – Sufficiency of the Evidence

¶ 16.   Defendant first asserts that the court should have sua sponte granted him a judgment of acquittal on the reckless-endangerment and unlawful-mischief counts. According to defendant,

5

the State's theory was that he threw a prybar at the driver's windshield, and the State was required and failed to prove this fact. Defendant construes the evidence in his favor and asserts that it is insufficient to support his convictions.

¶ 17. Defendant did not preserve these arguments through a properly filed motion for judgment of acquittal. Thus, we review only for plain error. State v. Davis, 2020 VT 20, ¶ 20, __ Vt. __, __ A.3d __. "[P]lain error exists only in exceptional circumstances where a failure to recognize error would result in a miscarriage of justice, or where there is glaring error so grave and serious that it strikes at the very heart of the defendant's constitutional rights." Id. (quotation omitted). Further, "a court should move for acquittal only when the record reveals that the evidence is so tenuous that a conviction would be unconscionable." Id. ¶ 21 (quotation and alteration omitted). Defendant fails to satisfy these standards here.

¶ 18. Pursuant to the unobjected-to jury instructions, the jury was asked to decide if defendant "threw something at an occupied vehicle" for the reckless endangerment charge and "intentionally damaged a vehicle" for the unlawful mischief charge. The instructions are consistent with the statutory definitions of these crimes. See 13 V.S.A. § 1025 (providing that "[a] person who recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury" commits crime of reckless endangerment); id. § 3701(b) (providing that "[a] person who, with intent to damage property, and having no right to do so or any reasonable ground to believe that he or she has such a right, does any damage to any property which is valued in an amount exceeding $250.00" commits unlawful mischief). In other words, the alleged reckless conduct here was throwing "something" at an occupied vehicle, and the alleged unlawful mischief was intentionally damaging the victim's truck.

¶ 19. Assuming arguendo that the State was also required to prove that the object defendant threw and intentionally damaged the truck with was a prybar—as opposed to a different object—defendant fails to show that the evidence on this point was "so tenuous that a conviction

6

would be unconscionable." Davis, 2020 VT 20, ¶ 21. In conducting our review, we consider the evidence in the light most favorable to the State and disregard modifying evidence. See State v. Godfrey, 2010 VT 29, ¶ 13, 187 Vt. 495, 996 A.2d 237 (stating, in context of properly preserved motion for judgment of acquittal, that defendant bears "heavy burden" in overturning unanimous jury verdict and when considering sufficiency of evidence, Supreme Court views evidence in light most favorable to State and excludes modifying evidence). It is the sole province of the jury to evaluate the credibility of witnesses. Id. ¶ 23.

¶ 20. As set forth above, the driver testified that he saw a man in the road holding a large object that resembled a splitting maul or sledgehammer. He had seconds to see the object; it was dark, he was scared, and he could not definitively identify it. The object shattered the windshield on the driver's side, with a hole right where the driver's head would have been; it appeared that something punctured the windshield. There was a divot in the snow in the center of the roadway where an object apparently bounced off the windshield and hit the snow. Shortly after the incident, the police found a long metal prybar with a broken orange handle inside the Swans' garage. The prybar looked out of place; it was the only tool on the garage floor. The broken windshield contained orange fragments that were not there before. The officer testified that the orange plastic pieces appeared to have come from the prybar's handle and that the prybar could have caused the damage to the windshield. Assuming, without deciding, that the State was required to prove that defendant threw a prybar, the evidence was sufficient to establish this fact. See State v. Colby, 140 Vt. 638, 642, 443 A.2d 456, 457 (1982) ("[T]he guilt of a defendant in a criminal case may be proved by circumstantial evidence alone, if that evidence is otherwise proper.").

¶ 21. Defendant offers no persuasive argument to the contrary. He simply offers his own view of the evidence, taking it in the light most favorable to him. He argues, for example, that the prybar's handle was dirty, which he contends cuts against the notion that it was broken that evening. He argues that the photograph of the broken windshield "revealed [a] brownish-orangish

7

smear that could have come from a rock or a tree." Defendant also faults the driver for not testifying that he believed the prybar caused the damage. These were issues for the jury, as factfinder, to consider. As previously stated, in reviewing defendant's claim that he was entitled to a judgment of acquittal, we do not view the evidence in the light most favorable to defendant and we disregard modifying evidence. There was sufficient evidence here for the jury to find that defendant threw a prybar at the truck, and defendant was not entitled to a judgment of acquittal on the first two counts sua sponte.

### B. Third Count – Sufficiency of the Evidence and Jury Instruction Challenges

¶ 22. We next consider defendant's conviction for providing false information to a law enforcement officer. Defendant asserts that he was entitled to a sua sponte judgment of acquittal on this count because the State failed to specifically identify the false information he allegedly provided, the State's theory at trial was based on all of his statements, and the State failed to prove that each statement met the elements of the statute. Defendant acknowledges that, in its closing, the State identified the false statement at issue as "the fact that he denied throwing it." He asserts, however, that "it" referred to a sledgehammer and there was no evidence that he threw a sledgehammer. In support of these arguments, defendant again construes the evidence in his favor, asserting that he provided an accurate version of events and that he assisted police.

¶ 23. Defendant also raises several challenges to the jury instructions with respect to this count. He contends that the court "collapsed the mens rea requirements" for this count and turned it into a strict liability offense, although he does not explain how. He further argues that the instructions failed to ensure unanimity regarding the essential elements of the underlying act and his mens rea.

¶ 24. As none of these arguments were preserved, we review only for plain error. Davis, 2020 VT 20, ¶ 21. With respect to defendant's challenge to the jury instructions, "we examine the instructions in light of the record evidence as a whole and determine if any error would result in a

8

miscarriage of justice." State v. Herrick, 2011 VT 94, ¶ 18, 190 Vt. 292, 30 A.3d 1285. "[W]ereview the instructions in their entirety" and "[i]f the charge as a whole is not misleading, there is no plain error." Id.

¶ 25. While we reject defendant's characterization of the evidence and his assertion about a "collapsed mens rea," we agree that the jury instructions were inadequate to ensure unanimity.* Neither the charge nor the State's trial evidence identified precisely what information the jury needed to evaluate with respect to this count. Given defendant's multiple statements and the two distinct ways in which a violation of § 1754(a) can occur, we cannot be certain that the jury unanimously agreed that all, or at least one, of defendant's statements met the same statutory elements. We would reach the same conclusion even if we agreed that the State narrowed the allegedly false information to defendant's statement that he "didn't throw it" or "didn't throw anything." Given the flawed instructions, we reverse defendant's conviction on this count and remand this count for a new trial. See State v. Corliss, 149 Vt. 100, 101, 539 A.2d 557, 558 (1997) (reversing and remanding for new trial where Court concluded that "the State should have been required to elect the act it intended to rely upon for conviction, or the court should have required the jury to return a special verdict"); State v. Giroux, 151 Vt. 362, 361, 561 A.2d 403, 404 (1989)

---

* We reject defendant's favorable characterization of the evidence because, on review, we consider the evidence in the light most favorable to the State and disregard modifying evidence. State v. Albarelli, 2016 VT 119, ¶ 38, 203 Vt. 551, 159 A.3d 627.

We reject defendant's "collapsed mens rea" argument both because it is inadequately briefed and because the court's instruction did not make this a strict liability offense. We have construed 13 V.S.A. § 1754(a) to reflect three "intrinsically linked" elements that cannot "be checked off individually," but rather represent "one clause explaining the action necessary to violate § 1754(a)." Albarelli, 2016 VT 119, ¶ 33. The jury here was asked to decide if defendant made false statements for a particular purpose: "either to suggest falsely that someone was guilty of wrongdoing or to stop the police officer from investigating him." See id. ¶ 36 (emphasizing that 13 V.S.A. § 1754 does not "criminalize all false statements to law enforcement agents, regardless of a defendant's intent," but rather "prohibits false statements intended to deflect an investigation" or intended to implicate another). Defendant does not articulate how he believes the court made this a strict-liability offense, and the court's instruction does not support defendant's assertion.

9

(reversing and remanding for new trial "because of error in the court's jury instructions on reasonable doubt").

¶ 26.     We recognized in State v. Reed, 2017 VT 28, 204 Vt. 399, 169 A.3d 1278, that the State must specify the information alleged to have been falsely provided.  The failure to do so "becomes one of constitutional magnitude if a case is presented to the jury with multiple possible statements meeting an element of the offense and no specification of which statement all the jurors must find was knowingly false."  Id. ¶ 16.  We cited the "general rule that where there is evidence of more than one act that would constitute the offense charged, the State must specify the act for which it seeks a conviction."  Id. (quotation omitted); see also State v. Zele, 168 Vt. 154, 158, 716 A.2d 833, 836–37 (1998) (recognizing exception to this general rule and holding that "no election is required, when numerous acts are so related as to constitute a single transaction or offense" and that "[n]o election is required where a single criminal act is involved and the proof shows its commission in different modes and by different means" (citation and quotation omitted)).  Where the general rule applies, we observed that requiring the State to make an election "protects the defendant from the possibility that part of the jury will base its decision to convict on evidence of conduct different from that considered by the rest of the jury," which "would deprive the defendant of his right to a unanimous verdict based on a single offense."  Reed, 2017 VT 28, ¶ 16 (quotation omitted).

¶ 27.     While this issue was not raised by the defendant in Reed, we found a violation of this requirement that provided context for the sufficiency-of-the-evidence argument that the defendant did preserve.  In Reed, the defendant allegedly provided false information to a game warden in connection with the killing of an illegal buck.  We found no specification of the allegedly false information in the charge, supporting affidavit, or the State's trial evidence.  Id. ¶¶ 13, 14.  In its closing, the State for the first time "characteriz[ed] all of the defendant's statements concerning [what he did to the deer's] antlers as 'false information.' "   Id. ¶ 14.  The jury instructions,

however, did not explain "how the jury was to determine whether [the] defendant gave false information." Id. They did not, for example, indicate "whether the jury could find that any of the statements given to the warden would meet the [false-information] element"; if it must find that the statement "relate[d] to the antlers" as reflected in the State's closing; or specify "which of [the] defendant's statements with respect to the antlers the jury must find was false." Id.

¶ 28. Even if the analysis was confined to the allegedly false statements identified by the State in its closing—those "relate[d] to the antlers"—, we found the evidence insufficient to show that the statements were made "to deflect an investigation," the purpose element at issue in Reed. Id. ¶ 17. We construed the term "deflect" to require "a knowing lie affecting an investigation that is intended to turn the investigation away from the person making the statement." Id. ¶ 24 (emphasis omitted).

¶ 29. As relevant here, the defendant in Reed told the warden that he did not know what happened to the antler, which we considered akin to denying that he engaged in criminal conduct. We contrasted a simple denial with "a content-laden fabrication designed to send police off course, thereby interfering with their investigation." Id. (quotation omitted). We considered the defendant's denial to fall in the first category, concluding that it did not provide "evidence of affirmative misdirection" but rather left "police . . . in the same position they would have been in had the defendant instead remained silent." Id. ¶¶ 24, 28 (quotations omitted). For this and other reasons, we found the evidence insufficient in Reed to support the defendant's conviction and thus held that the trial court should have granted the defendant's properly preserved motion for a judgment of acquittal.

¶ 30. In many respects, we are faced with a similar situation here, mindful that a different standard of review applies. In this case, consistent with the terms of the statute, defendant was charged with "knowingly giv[ing] false information to any law enforcement officer with purpose to implicate another or to deflect an investigation from the person or another person." 13 V.S.A.

11

§ 1754(a). At trial, the State presented evidence about a variety of statements that defendant made to police, as recited above. Defendant told the officer that: he observed erratic operation all night long; a truck similar to the complainant's twice tried to run him down at the edge of the Swans' driveway, forcing him to hide behind two different trees; he "didn't throw anything" and did not own or know anything about a sledgehammer; and certain tire tracks (apparently belonging to the trooper's vehicle) had been left by the truck that tried to hit him. His conversation with the officer was recorded on video, which was played for the jury. At trial, defendant essentially reiterated this version of events with some additions.

¶ 31.    In its closing, the State referred to the false information at issue as the fact that defendant "denied throwing it," asserting that he did so either to suggest falsely that someone else was guilty or to try to stop the officer from investigating him.

¶ 32.    As in Reed, the jury was presented with numerous statements and the instructions did not explain how it should determine if "defendant gave false information." 2017 VT 28, ¶ 14. The instructions did not indicate if the jury had to limit its inquiry to the statement identified by the prosecutor in closing or if it "could find that any of the statements given to the [officer]" satisfied the requirements of the statute. Id. Both purpose elements were included in the charge, moreover, and the instructions did not specify that the jury must agree on a purpose element with respect to any particular statement.

¶ 33.    Even if we agreed that the factual basis for the charge was narrowed by the State in its closing, we would have the same concerns. As discussed in Reed, defendant's exculpatory statement—"I didn't throw it" or "I didn't throw anything"—, standing alone, would not satisfy the deflection element. See id. ¶¶ 28-29 (concluding that simply "[s]aying no, or its equivalent, to an incriminatory question in no way deflects the investigation" and construing term "deflect" as limited "to those acts that induce third party action—not merely exculpatory acts").

¶ 34.    The jury could have concluded, however, that taken in the context of the remainder of defendant's statements, it was made to implicate another, namely the driver.  Defendant's position at trial was that the driver broke his own windshield by driving erratically and he falsely blamed defendant for doing so to avoid getting into trouble.  Because of the way in which the jury instructions were worded, however, we cannot know if the jury based its conclusion on this statement alone and if so, whether its decision rested on a permissible or impermissible basis.  This was an error of constitutional magnitude that rises to the level of plain error.  See Vt. Const. ch. I, art. 10 (providing that defendant has right to unanimous jury verdict); see also V.R.Cr.P. 31(a) ("The verdict shall be unanimous.").  Unlike in Reed, the evidence here could support defendant's conviction for providing false information to a law enforcement officer and for that reason, we find it appropriate to reverse and remand this count for a new trial.

C.  Jury Instructions for Reckless Endangerment and Unlawful Mischief

¶ 35.    Finally, we turn to defendant's challenge to the jury instructions for the two remaining counts.  Defendant argues that the court erred by failing to define "reasonable doubt" and erred in explaining the unanimity requirement to the jury.  He also complains that the court did not instruct the jury regarding the presumption of innocence.  Defendant did not raise these arguments below and contends that he has demonstrated either "structural error" or plain error.

¶ 36.    The record reveals the following.  At the outset of the one-day trial, the court provided general instructions to the jury.  It provided a detailed explanation of the presumption of innocence and the State's burden to prove defendant's guilt beyond a reasonable doubt.  It offered an explanation of "reasonable doubt" and reiterated that the State must prove each element of each charge beyond a reasonable doubt.

¶ 37.    The trial lasted approximately six hours.  Following closing arguments, the court read final instructions to the jury; it also stated that it would provide the jurors written instructions

13

for their reference during deliberations. The written instructions in the trial court's file mirror the court's orally delivered preliminary and closing instructions.

¶ 38. In its final instructions, the court identified the elements of each crime with which defendant was charged. It reiterated that to find defendant guilty of reckless endangerment, the State needed to prove the requisite elements beyond a reasonable doubt. It again recited the State's burden in outlining the elements of unlawful mischief. The court instructed the jury that it "must reach a unanimous verdict" and that "[y]ou must all agree unanimously on every issue." It informed the jury that when it reached "unanimous agreement on all the charges," it should advise the court officer that it had reached a verdict. When the jury did reach its verdict, the court inquired if it was unanimous, and the foreperson replied that it was.

¶ 39. As reflected above, defendant's first two arguments lack record support. The court instructed the jury multiple times in its closing instructions that the State must prove defendant's guilt beyond a reasonable doubt. It had no obligation to further define this term. See State v. Levitt, 2016 VT 60, ¶ 8, 202 Vt. 193, 148 A.3d 204 ("The U.S. Constitution 'neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course.' " (quoting Victor v. Nebraska, 511 U.S. 1, 5 (1994)). Indeed, we have recognized that "attempting to define reasonable doubt is a hazardous undertaking," and we "discourage trial judges from trying such an explanation." Id. ¶ 14 (quotation omitted). We find it evident that "taken as a whole," the instructions here "correctly convey[ed] the concept of reasonable doubt to the jury," which is all that is required. Id. ¶¶ 8, 14 (quotation omitted) (reiterating that "[a]s long as the trial court 'instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, . . . the Constitution does not require any particular form of words be used in advising the jury of the government's burden of proof").

¶ 40. The court similarly did not err in its closing unanimity instruction. It instructed the jury that it "must reach a unanimous verdict" and that "[y]ou must all agree unanimously on every

14

issue." We reject defendant's argument that the instructions did not ensure unanimity with respect to the counts at issue here. There was only one act at issue in each count: did defendant engage in reckless conduct by throwing something at the truck and did he engage in unlawful mischief by intentionally damaging the complainant's truck. There was no risk here that some jurors might rely on certain conduct while others relied on other conduct, as in Reed or as we concluded above with respect to the false-information count. Cf. State v. Bellanger, 2018 VT 13, ¶ 9, 206 Vt. 489, 183 A.3d 550 ("To meet the unanimity rule, Vermont practice has generally required that where there is evidence of more than one act that would constitute the offense charged, the State must specify the act for which it seeks a conviction." (quotation omitted)). The instructions here were sufficient to ensure a unanimous verdict, and we presume that the instructions were followed. State v. Green, 2006 VT 64, ¶ 10, 180 Vt. 544, 904 A.2d 87 (mem.).

¶ 41. We thus turn to the presumption of innocence. The court addressed this subject in detail in its opening instructions, stating in relevant part as follows:

> Your job as jurors will be to decide whether the State has proven some or all of these charges beyond a reasonable doubt.
>
> The fact that the State has accused the defendant . . . of a crime is not evidence. The charges filed by the State are merely accusations, not proof of guilt. You are required to presume him to be innocent unless the evidence persuades you to the contrary beyond a reasonable doubt. The presumption of innocence is a piece of evidence to be considered by you along with all the other evidence in the case.
>
> The burden is on the State to prove its case and the burden of proof never shifts to [defendant]. He is not required to testify or to call any witnesses or to present any evidence. A defendant has an absolute right to remain silent and to rely entirely on the presumption that he or she is innocent until proven guilty.

¶ 42. The court did not reiterate this information in its final instructions although, as indicated above, it provided each juror a written copy of its preliminary and closing instructions for reference during deliberations.

¶ 43. To the extent that defendant argues that the omission of a presumption-of-innocence instruction from the court's final instructions in and of itself requires reversal, we reject that argument. The U.S. Supreme Court has expressly recognized that "the failure to give a requested instruction on the presumption of innocence does not in and of itself violate the Constitution" and that "such a failure must be evaluated in light of the totality of the circumstances—including all the instructions to the jury, the arguments of counsel, whether the weight of the evidence was overwhelming, and other relevant factors—to determine whether the defendant received a constitutionally fair trial." Kentucky v. Whorton, 441 U.S. 786, 789 (1979) (per curiam). The Court's holding in Sullivan v. Louisiana, cited by defendant, is not to the contrary. 508 U.S. 275, 279 (1993) (explaining that "[a]lthough most constitutional errors have been held amenable to harmless-error analysis, some will always invalidate the conviction," and holding that erroneous reasonable-doubt instruction can never be harmless).

¶ 44. The Whorton Court discussed the circumstances that had led it to reverse in an earlier case. In that case, it explained, the Court concluded that the defendant's due process rights were violated by the omission of a presumption-of-innocence instruction where "the trial judge's instructions were 'Spartan,' . . . the prosecutor improperly referred to the indictment and otherwise made remarks of dubious propriety," including suggesting "that the petitioner's status as a defendant tended to establish his guilt," and "the evidence against the defendant was weak." 441 U.S. at 788-89 (citations omitted). The combination of these factors, it explained, "created a genuine danger that the jury would convict petitioner on the basis of those extraneous considerations, rather than on the evidence introduced at trial." Id. (quotation omitted).

¶ 45. We are faced with a different situation here. Looking at the totality of the circumstances, defendant fails to show that he was denied due process based on the absence of this instruction. See id. at 788 (explaining that appropriate focus is "on the failure to give the instruction as it relate[s] to the overall fairness of the trial considered in its entirety").

16

¶ 46. First, the court addressed the presumption of innocence in detail at the outset of trial. See State v. Muscari, 174 Vt. 101, 116, 807 A.2d 407, 419 (2002) (recognizing that preliminary instructions "help the jury identify, recall, and evaluate the pertinent evidence [and] enhance[ ] juror's ability to remember information presented at trial and to link the evidence to relevant issues" (quotation omitted)); see also U.S. v. Ruppel, 666 F.2d 261, 274 (5th Cir. 1982) (lauding trial court's decision to "instruct[] the jury on the fundamentals of a criminal trial prior to taking any evidence" (citing ABA Advisory Committee on the Criminal Trial, Trial by Jury § 4.6(d) (1968)). The trial was very short. The court delivered its closing instructions approximately six hours after its preliminary ones. The court emphasized the State's burden of proof in its final instructions, and it also provided jurors a written copy of its preliminary and closing instructions for reference.

¶ 47. This case presented a credibility contest. The driver testified that defendant threw something at his truck, smashing his windshield and causing him to go off the road; defendant denied throwing anything and testified that the driver was operating erratically and twice drove at him, forcing him to hide. The weight of the evidence, including the physical evidence, overwhelmingly supported the driver's version of events. The windshield was punctured right where the driver's head would have been; there was a divot in the snow near the truck's tracks where it appeared that something fell. The windshield appeared to have been struck with something that left orange flakes. A prybar with a broken orange handle was found in the garage of the property that defendant was visiting; the tool looked out of place. Police observed no signs of erratic operation on the road and saw no physical evidence to support defendant's assertion that the truck twice drove at him, unless, as the officer testified, defendant was standing in the middle of the road. Under all of the circumstances, we conclude that the court's omission of the presumption-of-innocence instruction in its final oral instructions was not reversible error.

17

¶ 48.    Other courts have reached similar conclusions, including where the presumption-of-innocence instruction was given preliminarily and then not repeated at the end of an eleven-day trial.  See Ruppel, 666 F.2d 261.  In Ruppel, the trial court asked the jury in its final charge to "recall some general definitions and instructions, including the presumption of innocence, given at the outset of the trial."  Id. at 274 (quotations omitted).  While the appeals court emphasized that the court should have reiterated this instruction, it found no reversible error under the totality of the circumstances.  It cited the trial court's discussion of the presumption at the beginning of trial and its reference to the preliminary instructions in the final charge; it also noted that the defendant's attorney had "referred to the presumption of innocence during his closing argument."  Id.  "Given this background," the court was "unwilling to believe that the jury retired to deliberate less than fully aware of the presumption of innocence."  Id. at 274-75.

¶ 49.    Looking at the record in the instant case, we reach the same conclusion.  While the presumption-of-innocence instruction should have been repeated by the court as part of its closing instructions, its omission here did not "deprive[] [defendant] of due process of law in light of the totality of the circumstances."  Whorton, 441 U.S. at 789-90.

¶ 50.    Finally, defendant takes issue with the court's submission of written instructions to the jury.  He questions whether the jurors read the written instructions and whether the instructions in the court's file were the same ones submitted to the jury.  He suggests that there was a conflict between the written and oral instructions, although he cites no such conflict.  Building on this unsupported assertion, he contends that "the court's procedure of giving written instructions outside of [his] presence that differed from the oral instructions to the jurors in open court" deprived him of his right to be present during all critical stages of his trial.

¶ 51.    Defendant provides no basis for concluding that the written instructions in the trial court's file differed from the written instructions provided to the jury, and we reject this argument.

He identifies no specific or meaningful conflict between the written and oral instructions, and we find none. We similarly reject defendant's assertion that he was deprived of his due process right to be present during the critical stages of his trial. Defendant was present when the court delivered its preliminary and closing instructions to the jury and, as set forth above, the written instructions were the same as the oral instructions. We thus find defendant's final claims of error without merit.

We reverse and remand defendant's conviction for providing false information to a law enforcement officer for a new trial; we affirm defendant's convictions for reckless endangerment and unlawful mischief.

FOR THE COURT:

_____

Associate Justice